207 F.3d 599 (9th Cir. 2000)
 JENNIFER L. PASSANTINO, and the marital community; CHARLES PASSANTINO, and the marital community, Plaintiffs-Appellees-Cross-Appellants,
v.
JOHNSON & JOHNSON CONSUMER PRODUCTS, INC., dba Customer Support Center, Defendant-Appellant-Cross-Appellee.
UNITED STATES OF AMERICA, Intervenor.
 No. 97-36191 No. 98-35036
 UNITED STATES COURT OF APPEAL FOR THE NINTH CIRCUIT
 Argued and Submitted March 11, 1999 Seattle, Washington
Filed March 10, 2000
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Steve B. Berlin, Ronald J. Holland, Terry Chapko, Katherine C. Franklin, Littler, Mendelson, et. al., Seattle, Washington; Susan L. Barnes, McCay, Chadwell & Matthews, Seattle, Washington; Paul G. Ulrich, Ulrich, Kessler & Anger, Phoenix, Arizona; for Defendants-Appellants.
 Marsha S. Berzon, Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, California; John R. Connelly, Jr., Victoria L. Vreeland, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, Seattle, Washington; for Plaintiffs-Appellees.
 David O. Ogden, Marleigh D. Dover, and Dana J. Martin, Department of Justice, Washington, D.C., for Intervenor.
 Elliot L. Bien and E. Elizabeth Summers, Bien & Summers, Novato, California, for Amicus Curiae Chamber of Commerce of the United States.
 C. Gregory Stewart, Philip B. Sklover, and Robert J. Gregory, EEOC, Washington, D.C., for Amicus Curiae Equal Employment Opportunity.
 On Appeal from the United States District Court for the Western District of Washington; Robert J. Bryan, District Judge, Presiding. D.C. No. CV-96-05044-RJB
 Before: B. FLETCHER, REINHARDT, THOMAS, Circuit Judges.
 
 
 1
 Reinhardt, Circuit Judge,
 
 
 2
 Defendant, Johnson and Johnson Consumer Products, Inc. (hereinafter CPI), a subsidiary of Johnson & Johnson, appeals the district court's decision and order entering judgment for plaintiff, Jennifer Passantino(hereinafter Passantino), after a jury awarded her substantial damages. We affirm the district court's decision in all respects but one. We remand for a new trial on the punitive damages issue in light of the Supreme Court's decision in Kolstad v. American Dental Association, 119 S.Ct. 2118 (1999). With respect to the other issues on this appeal, we hold that venue was proper, that the evidence was sufficient to support the jury's finding that CPI retaliated against Passantino, that the district court did not abuse its discretion in admitting a taped interview into evidence, that the district court did not err in its jury instructions, and that the district court acted within its discretion in allocating all front pay, backpay, and compensatory damages to Passantino's state law claims while allocating the punitive damages to Passantino's Title VII claim. Additionally, we hold that, under Washington state law, the district court did not err in determining the front pay, backpay, and compensatory damage awards. Finally, we affirm the district court's award of attorneys' fees.
 
 I. FACTS
 
 3
 Jennifer Passantino began working for Johnson & Johnson Consumer Products Inc. (CPI) in 1979, when she was 25 years old. Over the next 18 years, she rose through the ranks at CPI to become one of its most successful female managers, and was characterized by executives as "a leader in her field." She was personally responsible for selling $12 million in product annually, within a division with total sales of $48 million. Her success is all the more remarkable because she worked within CPI's "military" division, characterized by one of its own executives as an "old boy network." In spite of her success, Passantino's career prospects deteriorated rapidly after she complained that her advancement within the company was being limited by sex discrimination.
 
 
 4
 Passantino started with CPI in 1979 as a Health Care territory manager in the San Francisco Bay area. In 1982, she was promoted to territory manager for northern California and Washington state in the military sales department. After a brief stint in the child development products division, she was asked to return to the military sales department. She became area manager for the western region in the military sales department in 1986. Her title was changed to Western Regional Manager in 1987. In 1988, with CPI's permission, Passantino relocated to Tacoma, Washington. She was promoted to National Account Manager in December, 1989, a position she held for the remainder of her employment with CPI.
 
 
 5
 Passantino maintained a home office, as CPI requested. (Most sales persons within CPI had home offices.) Passantino testified that she was on the "developmental" path, which is the career path for employees within sales who are in line for executive and management positions. Her testimony is confirmed by her performance reviews, which were consistently "outstanding" and "above average." For example, her 1992 performance report which was considered at her May 1993 performance evaluation meeting with her supervisor, Lew Williams, stated that "Jennifer demonstrates very strong selling skills, organizational ability, and good business judgment. She has developed the sales and promotional plan for Key Accounts, generating 12 million dollars in Johnson & Johnson annual volume." It added that she was "well qualified" and should be "strongly considered" for promotions within CPI's parent company, Johnson & Johnson. In fact, Williams discussed several promotional opportunities with her. As the Western regional manager, Passantino was rated the employee with the greatest promotional potential in her division.
 
 
 6
 Here, it is useful to describe CPI's advancement track in order to help explain Passantino's history with the company. The track was composed of multiple "levels." Level 3 includes mid level managers, Level 4 includes upper level managers and staff directors, and Level 5 refers to executive and corporate officer jobs. Passantino, as a National Account Manager, held a high-end Level 3 position. Making the step between Level 3 and 4 is very important to staying on the "promotion" track, and Level 4 pays approximately $50,000 more than Level 3. Level 5 positions carry very high compensation, as much as $200,000 more than Passantino's salary at Level 3. In spite of the importance of promotion, the method for determining who was to advance within the company was neither systematic nor fair. Instead, employees were promoted through what the district court called "the worst kind of a good old boy system that allowed discrimination and discouraged reasonable questions about the promotion process."
 
 
 7
 Despite her qualifications for promotion and her string of positive reviews, Passantino began to suspect that, because of her sex, she had been passed over for several promotions for which she was qualified. Several events gave her reason to suspect discrimination. First, Williams, her supervisor, exhibited sexist behavior. He referred to women buyers as "PMS," "menstrual," and "dragon lady." He also stated that most women probably just wanted to stay home. This sexism was not limited to Williams. Passantino also testified that two co-workers, VanDerveer and Kenan, had a condescending attitude towards women. Most important, during her 1993 performance evaluation meeting, Williams told Passantino that she should consider looking outside the company for employment because he did not believe that either the company or his boss was committed to promoting women.
 
 
 8
 In 1993, both Passantino and Jackie Upshaw, the only other female manager in the military division, voiced complaints to Williams. First, Passantino complained about the conduct of Van Derveer and Kenan, as well as about Williams' behavior. Up shaw also told Williams that she found his use of crude language troublesome. Both women testified that Williams' response was inadequate; Williams was short and brusque with Passantino and told her that it was her problem to get along with her co-workers.
 
 
 9
 Following the complaints by Passantino and Upshaw, the offensive behavior of all three men increased both in degree and frequency. Although Passantino's 1993 performance report was good overall, Williams was brusque at the subsequent performance evaluation meeting and gave her a low rating for "relationship with peers."[1] From this point on, Passantino felt she was slighted when trying to speak, and was the subject of derision generally -co-workers rolled their eyes at her suggestions, and there were side-bar conversations among other managers that excluded her. In short, after Passantino complained, she was no longer taken seriously[2].
 
 
 10
 In 1994, her opportunities for advancement within the company appeared to further close down. Following Johnson & Johnson's reorganization, Passantino expressed interest in a particular sales administration manager position, but she was not interviewed for the job and the position was filled by a male coworker about whom she had complained to Williams. In October of that year, Passantino learned about three newly-created positions (National Commissary Manager, Director of Trade Marketing, and Manager of Sales Administration) that she felt would offer her greater exposure, experience, and higher sales volume than her current position.However, these jobs were filled, before she had a chance to apply and, without being advertised openly, by the two men she had complained of and by a third male employee from outside the division.
 
 
 11
 In November 1994, Passantino contacted CPI's EEO officer and was warned several times that if she made a complaint, she would have to "live with the burden of coming forward" because the decision to complain "could have many ramifications." In spite of these warnings, Passantino formally complained to Doug Soo Hoo in the Human Resources department. Soo Hoo offered to try to determine whether he could raise her concerns without revealing Passantino's identity. He also offered to perform a salary analysis in order to see if there was any truth to Passantino's suspicion that she was being paid less than similarly-situated male workers. Passantino testified that Soo Hoo never provided her with the results of his inquiry.
 
 
 12
 In December, 1994, Passantino decided to lodge a formal complaint. In response to her complaint, Soo Hoo contacted Upshaw, who supported Passantino's version of the facts and echoed her concerns about discrimination. In January 1995, a meeting was held in New Jersey with Soo Hoo, Williams, John Hogan, who was Vice President of Sales, Passantino, and Ruth Hague from the Employee Assistance Program. At this meeting, Passantino recounted her complaints. Williams, her supervisor, responded that the military market was an "old boy network" in which it was hard for women to be successful. He also asked Passantino directly if she thought he was a sexist.
 
 
 13
 A second meeting was held in February, also in New Jersey. First, Williams and Hogan conducted Passantino's 1995 performance review, based on her 1994 evaluation report. She was given a good review and told she was qualified for a number of promotional positions. Then, Hogan told Passantino that his salary analysis had revealed no discrepancies and no discrimination. Although Passantino never saw this analysis, a salary analysis document was placed in her personnel file. This document falsely reported that Kenan -one of Passantino's colleagues about whom she had complained -received a performance rating of "5," while in fact he had received a "4." Another performance review in the document similarly misrepresented another male manager's performance rating. Passantino asserts that these ratings were fabricated in order to justify the fact that these male workers were better paid than she. Apart from this, her complaints were not addressed[3].
 
 
 14
 At a subsequent division meeting, Hogan said that everyone needed to "shape up and act professional" or they would be "off the team." He also indicated his support for Williams. Both Passantino and Upshaw testified that they understood this to be a public rebuke of them for their complaints. Both women felt that they were being told that if they did not shut up they would be fired.
 
 
 15
 Passantino remained unsatisfied with CPI's response to her complaint. On March 16, 1995, she informed Soo Hoo of her intentions to seek private legal counsel. She filed an EEOC complaint in June, 1995. Thereafter Passantino testified that she experienced a range of retaliatory acts by CPI, making it nearly impossible for her to perform her job effectively. Job responsibilities (such as her training duties) were removed, accounts (including the European account) were transferred to other employees without notice, and she was no longer included in division managers' meetings, such as those concerning development of the division business plan. In addition, her performance objectives were reduced(which, according to her testimony, indicated that she was considered less capable than before her complaint) and her job title was changed (and then restored after she protested). Passantino also testified that other actions were taken which undermined her performance. She stated that Williams became distant and communicated less with her, that she received product and sales information late, and that she lost out on bonuses (including an award trip) and sales opportunities as a result. Finally, Passantino stated that Williams made comments demeaning her participation in the policy groups that she had joined, even though she had joined them upon his suggestion, in order to enhance her advancement within the military division.
 
 
 16
 Passantino testified, and provided documentary corroboration to prove, that prior to her complaints she was consistently regarded as well-qualified for promotion into upper management. After her complaints, and particularly after her public EEOC complaint, however, it was a different story. Passantino was told by Hogan that she would have to accept taking a step back in order to advance, and that she should accept a district manager job, which is the lowest position within her job grade. Her review also stated, for the first time in years, that she was not qualified for a national account manager position. Her 1997 promotional assessment described her as "not to VP level," an obvious sign that, as Passantino put it, she was "losing ground." For some unexplained reason, Williams was instructed to send his evaluations of Passantino and Upshaw to Hogan, the Vice President, before releasing them to the two women. No other employees' evaluations were similarly screened.
 
 
 17
 CPI also retaliated against Passantino by offering her demotions, without always making clear that the jobs offered were below her current level. After initiating her complaints, Passantino received three offers of district manager positions. She rejected these jobs as demotions. Then, in August 1995, she was offered the position of National Accounts Manager in Dallas. Although this would have been a lateral move, it would have been undertaken as a part of a test group, with the distinct possibility of layoffs in the immediate future, Passantino accepted on the condition that CPI guarantee her one year of employment, absent cause for termination, as insurance against the inherently risky undertaking. CPI refused. In March 1996, Passantino rejected a district manager position in Los Angeles because it was a "step backwards" with no potential for salary growth (and a higher cost of living). Passantino was then offered a demotion to a position as a sales administration manager, with a much lower salary range. In this position, she would have lost her company car, had no opportunity for commissions, and would have had to live in a more expensive area. Passantino accepted the position, however, on the condition that she receive a year of guaranteed employment. Again rejecting her conditional acceptance, Hogan told her not to take the job, that the position was two steps backwards, and that it was only offered to Passantino because it was one of the jobs involved in her litigation. Finally, she rejected another position which was a step back with no potential for salary growth. During the same period, on a different occasion, when Passantino expressed interest in a new military marketing position, Williams told her she should not be interested in that position because it paid less, even though in fact that position paid $20,000 more than the position she held at the time.
 
 
 18
 Ultimately, Hogan told Passantino that because she refused to accept these district manager positions (which were demotions), she would not be considered for higher positions. He also told her that her decision not to accept the demotions meant that she could be deemed no longer promotable. After August 1996, Passantino did not receive any further offers.
 
 
 19
 Throughout this period, which followed her complaints, CPI executives were repeatedly vague about whether positions offered to Passantino were promotions, demotions, or lateral transfers. For example, Hogan initially characterized the district manager demotions as promotions. In a letter sent several months later, equivocation marked CPI's other job offers and its responses to her inquiries[4]: Passantino never knew if she was considering a job that would improve her prospects or effectively end career's advancement opportunities.
 
 
 20
 Passantino testified that, as a result of this stressful series of events, she constantly worried, cried, and felt trapped and upset. She felt she was forced to spend less time with her family because she feared she would lose her job, given that her performance rating had been declining. She suffered stomach problems, rashes, and headaches which required medical attention. In addition, she sought counseling from her pastor. Most important, her advancement within the company was brought to a halt.
 
 II. PROCEDURAL HISTORY
 
 21
 In January, 1996, Passantino brought this action in the United States District Court for the Western District of Washington for violations of Title VII and the Washington Law Against Discrimination. CPI immediately moved for a change of venue to New Jersey, which was denied.
 
 
 22
 Following a jury trial, the jury returned a large verdict in Passantino's favor. The jury found that although CPI had not discriminated against Passantino initially, it did retaliate against her for complaining about what she perceived as sex discrimination. The jury awarded Passantino $100,000 in back pay, $2,000,000 in front pay, $1,000,000 in compensatory emotional distress damages, and $8,600,000 in punitive damages. CPI moved to strike or reduce the punitive and compensatory damage awards, which the court granted in part and denied in part. The court allocated all of the compensatory damages, front pay, and back pay to Passantino's state law claim and all of the punitive damages to the Title VII claim. It then reduced the punitive damage award to the $300,000 Title VII cap and affirmed the remainder of the award.[5] CPI then moved for judgment as a matter of law, or in the alternative for a new trial, or to amend the judgment; all were denied. The court then awarded Passantino $580,414 in attorney's fees, costs, and expenses.
 
 III. VENUE
 
 23
 CPI argues that venue was improper in Washington, because the unlawfulemployment practices at issue occurred in New Jersey. We review the district court's venue ruling de novo. Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 841 (9th Cir. 1986). CPI argues that when a plaintiff alleges a discriminatory or retaliatory failure to promote, the decision not to promote is the sole act that can constitute the unlawful employment practice for venue purposes. Thus, under CPI's theory, for purposes of promotion claims, unlawful employment action "is committed" where the decision to take that action is made. Passantino counters that the unlawful action occurs where its effects are felt.[6]
 
 
 24
 Title VII authorizes suit "in any judicial district in the State in which the unlawful employment practice is alleged to at $300,000. 42 U.S.C. S 1981a(b)(3). Backpay does not constitute damages for purposes of the cap. 42 U.S.C. S 1981a(2) have been committed" as well as in the district where employment records are kept, in the district where the plaintiff would have worked but for the alleged unlawful practice, and, if those provisions fail to provide a forum, in the district where the defendant keeps its principal office. 42 U.S.C. S 2000e-5(f)(3); Johnson v. Payless Drug Store Northwest, 950 F.2d 586 (9th Cir. 1991).[7] Some courts have noted that "this broad provision for alternative forums was necessary to support the desire of Congress to afford citizens full and easy redress of civil rights grievances." Richardson v. Alabama State Board of Education, 935 F.2d 1240, 1248 (11th Cir. 1991). In fact, the only limitation contemplated by the provision is that it seeks to "limit venue to the judicial district concerned with the alleged discrimination." Stebbins v. State Farm Mutual Ins., 413 F.2d 1100, 1102 (D.C. Cir. 1969); Ford v. Valmac Industries, Inc., 494 F.2d 330, 332 (10th Cir. 1974).
 
 
 25
 In general, the effect of Title VII's venue provision is to allow suit in the judicial district in which the plaintiff worked or would have worked. See, e.g., Montero v. AGCO Corp., 192 F.3d 856 (9th Cir. 1999) (suit brought in district where plaintiff worked). This is consistent with our case law in analogous contexts. For example, in Varsic v. United States District Court, 607 F.2d 245 (9th Cir. 1979), a case involving a suit against a pension fund, we found venue to be proper where the employee works (and earns his pension credits). Id. at 247. We rejected the Fund's argument that venue should be limited to the district in which the Fund is administered because that district is where the decisionmaking for the plan's administration takes place. Id. at 248.
 
 
 26
 We have also held that personal jurisdiction over a defendant may be proper where the defendant has committed an act which has effects in a state, because the defendant "purposefully directed" its economic activity towards that state. Haisten v. Grass Valley Medical Reimbursement Fund, 784 F.2d 1392, 1397-98 (9th Cir. 1986). In Haisten, we held that jurisdiction was proper even though the defendant had absolutely no physical contact with California, because its policies had effects in the state, and because California had an interest in providing a forum for the protection of its residents. Id. at 1399. See also Gordy v. Daily News, 95 F.3d 829 (9th Cir. 1996) (finding personal jurisdiction proper in California defamation action against New York newspaper because 13 to 18 California residents subscribed to the paper)[8]. Thus, the statute itself and analogouscase law suggest that venue should be found where the effect of the unlawful employment practice is felt: where the plaintiff works, and the decision to engage in that practice is implemented.
 
 
 27
 CPI, however, would have us reject such a rule, at least for cases involving failure to promote, in favor of one that would allow venue only where the decision to commit the unlawful employment practice is made. We find this theory unpersuasive for several reasons. First, CPI's theory would require us to draw a distinction between promotion claims and other types of Title VII claims -which allow venue where the plaintiff is employed. Had Passantino been wrongfully discharged or subjected to a hostile work environment, she could have sued in the district in which she worked. Nothing in the text or history of the statute's venue provision suggests that a different rule should apply in failure-to-promote cases. Plaintiffs unlawfully denied a promotion, like those discharged, feel the effects of their injury where they actually work.
 
 
 28
 CPI suggests that the rule advanced by Passantino would leave corporations which employ people in far-away home offices vulnerable to suit in distant fora, a problem which it warns will increase in the internet age. CPI is concerned that "potential plaintiffs could evaluate their preferred locations for bringing a lawsuit and simply locate their home offices within that jurisdiction." This forum shopping scenario seems fanciful; we doubt that many people would reorganize their entire lives by moving home offices to other judicial districts in anticipation of as yet uncommitted acts of discrimination, in order to file Title VII actions in those districts. It is of more concern that national companies with distant offices might try to force plaintiffs to litigate far away from their homes, as CPI seeks to do here. Forcing the plaintiff to litigate in a federal court on the other side of the country would significantly increase the plaintiffs' costs of prosecuting her action. CPI's theory would create a substantial burden on plaintiffs working for national sales companies, a burden inconsistent with the beneficent purposes of Title VII.
 
 
 29
 This is not to suggest that an action involving a failure to promote is not also appropriately brought in the district in which the employment decision is made. CPI rightly points out that that district also has some interest in an action involving promotions. Here, however, we need not choose between districts. Title VII's venue provision obviously contemplates the possibility that several districts could provide an appropriate venue for the same action. For example, a company could keep business records in an office located in one judicial district, but engage in discriminatory hiring practices at a different office in another district. An action could properly be brought in either district. See 42 U.S.C. S 2000e-5(f)(3). Thus, we hold that venue is proper in both the forum where the employment decision is made and the forum in which that decision is implemented or its effects are felt.
 
 IV. RETALIATION
 
 30
 CPI also appeals the district court's denial of its motion for judgment as a matter of law on Passantino's retaliation claim. We review the district court's decision de novo, and reverse only if the evidence, viewed in the light most favorable to the prevailing party, admits only of a contrary conclusion. Omega Environmental, Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1161 (9th Cir. 1997).
 
 
 31
 Under Title VII, a plaintiff may establish a prima facie case of retaliation by showing that (1) she engaged in activity protected under Title VII, (2) the employer subjected her to an adverse employmentdecision, and (3) there was a causal link between the protected activity and the employer's action. Yartzoff v. Thomas, 809 F.2d 1371, 1375 (9th Cir. 1987). Initially, we note that Passantino's informal complaints to Williams in 1993 constitute a protected activity, such that actions taken against her after these initial complaints are appropriately the subject of her retaliation claim. See, e.g., Moyo v. Gomez, 40 F.3d 982 (9th Cir. 1994) (allowing retaliation claim based on informal protest of allegedly discriminatory policy).
 
 
 32
 CPI contends that Passantino suffered no adverse employment action. However, ample evidence exists in the record for the jury to have made a contrary finding. There was evidence that her complaints affected a performance review she received and resulted in decreased job responsibilities. Other evidence supported her contention that CPI responded to her complaints by transferring accounts out of her portfolio, excluding her from planning meetings, and preventing her from receiving information she needed. The jury could also have found that CPI substantially downgraded her promotability status and that she failed to receive promotions because of her complaint. We have held such actions sufficient to establish retaliation. For example, in Hashimoto v. Dalton, 118 F.3d 671, 675 (9th Cir. 1997) we held that the dissemination of a negative job reference constituted retaliation. Similarly, in Yartzoff, we held that transfers of job duties and "undeserved" performance ratings were adverse employment decisions. Yartzoff, 809 F.2d at 1376. See also Strother v. Southern California Permanente Group, 79 F.3d 859, 869 (9th Cir. 1996) (exclusion from meetings, denial of administrative support, and transfer of duties deemed retaliatory).
 
 
 33
 The purpose of Title VII's anti-retaliation provision is to bar employers from taking actions which could have "a deleterious effect on the exercise of these rights by others." Garcia v. Lawn, 805 F.2d 1400, 1405 (9th Cir. 1986). Title VII allows employees to freely report actions that they reasonably believe are discriminatory, even if those actions are in fact lawful. Moyo, 40 F.3d at 985. Absent a judicial remedy, the type of actions Passantino asserts her employer engaged in could discourage other employees from speaking freely about discrimination. We hold that the actions the jury could properly have attributed to CPI were sufficient to constitute retaliation within the meaning of Title VII.
 
 
 34
 CPI also argues that there was insufficient evidence to establish that the adverse employment actions occurred because of CPI's desire to retaliate against Passantino. However, we have held that causation may be established based on the timing of the relevant actions. Specifically, when adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred. Yartzoff, 809 F.2d at 1375-76 (finding causation based on timing of retaliation); Miller v. Fairchild Industries, Inc., 885 F.2d 498, 505 (9th Cir. 1989) (holding that discharges 42 and 59 days after EEOC hearings were sufficient to establish prima facie case of causation); Hashimoto, 118 F.3d at 680. Moreover, we have held that evidence based on timing can be sufficient to let the issue go to the jury, even in the face of alternative reasons proffered by the defendant. Strother, 79 F.3d at 870-71. While CPI correctly notes that there was some evidence at trial that the alteration in job responsibilities and the obstruction of information may not have been due to retaliatory motives, the evidence as a whole does not compel this conclusion[9].
 
 
 35
 Finally, CPI argues that we should order a new trial on liability to allow it to pursue an affirmative defense under Burlington Industries v. Ellerth, 524 U.S. 742, 118 S.Ct 2257 (1998). establishes an affirmative defense to evidence that "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and that "the plaintiff employee unreasonably failed to take advantage of Burlington liability where an employer shows by a preponderance of the any preventive or corrective opportunities provided by the employer." Id. at 2270. However, as Burlington expressly states, "[n]o affirmative defense is available . . . when the supervisor's harassment culminates in a tangible employment action." Id. at 2270. Thus, while the defense may be available when the employer can disclaim liability for a hostile environment created by a supervisor in contravention of company policy,[10] it is not available to allow the employer to escape liability for discriminatory tangible employment actions, because such actions are necessarily those of the company itself[11].
 
 V. ADMISSION OF THE HOGAN TAPE
 
 36
 CPI argues that the district court erred by allowing Passantino to impeach defense witness Hogan using a portion of a tape of the interview he conducted with Passantino. CPI claims that because its copy of that portion of the tape was allegedly unclear, it was error to admit Passantino's version of the tape. The tape exposed Hogan lying to Passantino about whether a particular job was a promotion, a lateral, or a demotion. We review the district court's decision for abuse of discretion. EEOC v. Pape Lift, Inc., 115 F.3d 676, 680 (9th Cir. 1997). The moving party must demonstrate prejudice. California Sansome Co. v. U.S. Gypsum, 55 F.3d 1402, 1405 (9th Cir. 1995).
 
 
 37
 Here, we need not reach the merits, because CPI cannot show prejudice. While CPI complains of the prejudicial effect of Hogan's statements recorded on Passantino's version of the tape (which the jury heard), Hogan also stated on a different, uncontested part of the tape that the job Passantino inquired about was on the "same level" as her current job. In addition to being false, this statement was essentially identical to the statement from the contested part of the tape. Thus, the jury would have heard Hogan's false and damaging statement regardless of which version of the tape was used.
 
 
 38
 CPI asserts that it need not show prejudice where plaintiff has engaged in intentional misconduct. Although we could find no Ninth Circuit case that supports this proposition, we need not reach the question because there is no evidence of intentional misconduct here. Both CPI and Passantino had copies of the tape. If, as CPI alleges, its copy of the of the tape was inaudible, it could have requested an audible copy prior to Passantino's introduction of the tape into evidence. The district court's decision to include the whole tape did not constitute an abuse of discretion.
 
 VI. JURY INSTRUCTIONS
 
 39
 CPI argues that the district court erred by not giving the mitigationinstruction described in Ford Motor Co. v. EEOC, 458 U.S. 219, 241 (1982), and by not giving an instruction explaining reduction to present value. Because all of the non-punitive damages were allocated to the state law claims, state law governs the substance of the jury instructions given at trial. In re Asbestos Cases, 847 F.2d 523, 524 (9th Cir. 1988); Miller v. Republic National Life Insurance, 789 F.2d 1336, 1338-39 (9th Cir. 1986) (holding that, in diversity action, substance of jury instructions is governed by state law). We review errors for abuse of discretion and reverse only if we find prejudice. Abromson v. American Pacific Corp., 114 F.3d 898, 902 (9th Cir. 1997).
 
 
 40
 CPI cites no case suggesting that the Ford instruction, authorized in the Title VII context, is required under Washington law, and we have found no cases requiring it. In fact, as a general matter, Washington discrimination law remedies are more robust than those authorized under Title VII. See Martini v. Boeing Co., 971 P.2d 45, 53 (Wash. 1999) (en banc). In any case, any error would have been harmless. The jury's verdict with respect to retaliation makes clear that it did not think that the offers made to Passantino were promotions, so it would not have found that Passantino failed to mitigate by not accepting the retaliatory offers. Moreover, the jury received a general mitigation instruction which is consistent with the Ford instruction, and counsel, with the court's approval, was given the opportunity to argue the Ford instruction to the jury.
 
 
 41
 CPI also argues that the Supreme Court's decision in Monessen Southwestern Railway Co. v. Morgan, 486 U.S. 330 (1988) requires that the jury be instructed to discount its damages award to present value.[12] In Monessen, the Supreme Court reversed a decision after the trial judge told the jury it could not discount its damage award to present value. 486 U.S. at 339. However, nothing in that opinion requires any particular method of dealing with present value issues, except insofar as it requires that "the present value calculation is to be made by the `trier of fact.'" Id. at 341.
 
 
 42
 The district court refused to give the instruction here because there was no evidence presented as to what the appropriate discount rate should be. This decision was correct, because under Washington and Ninth Circuit law, a present value instruction should not be given where no evidence of appropriate discount rates has been introduced. See Hinzman v. Palmanteer, 501 P.2d 1228, 1233-34 (Wa.1972)[13]. Thus, the rule applied by the relevant Washington law.
 
 VII. ALLOCATION OF DAMAGES
 
 43
 CPI argues that the district court erred in allocating the jury's damage award. The district court allocated all of the compensatory damages, front pay, and backpay to Passantino's state law claim, while allocating the punitive damages to her Title VII claim. CPI contends that the entire award (apart from backpay) should have been subject to the $300,000 Title VII damages cap[14]. While the districtcourt generally has discretion regarding how to allocate the damage award, to the extent that the allocation decision rests on an interpretation of the statute, we review it de novo. Hudson v. Reno, 130 F.3d 1193, 1198 (6th Cir. 1997); Johnson v. Shalala, 35 F.3d 401, 405 (9th Cir. 1994).
 
 
 44
 CPI claims that because the jury instructions said that punitive damages could be awarded only if the jury awarded compensatory damages on Passantino's federal claims, and because the jury awarded punitive damages, the jurors must have intended to award federal compensatory damages. While this reasoning is correct, it does not follow that the court erred by allocating the compensatory damages to the state law claims. As the verdict form indicates, the jury found for Passantino on both federal and state law retaliation claims, and awarded damages without specifying any particular allocation. Thus, the most reasonable assumption is that the jury awarded the same damages on both the federal and state claims. The damages were duplicative, however, because the two claims were essentially the same; they involved the same conduct and were evaluated under the same legal standard. In the absence of a contrary directive, such as a statutory mandate that damages be allocated to one claim rather than another, the district court had authority to allocate the damages to either claim. Faced with the general verdict, the district court chose to allocate the award to the state rather than the federal claim. As the jury had awarded damages without differentiating between the claims, the awards were effectively fungible, and the district court's action was entirely within its discretion and consistent with the jury's verdict. See Martini v. Federal National Mortgage Association, 178 F.3d 1336, 1349-50 (D.C. Cir. 1999) (treating damage award as interchangeable under local and federal law where standards of liability are identical).
 
 
 45
 In contrast to the district court's allocation method, CPI suggests that all the damages should be allocated to Passantino's Title VII claim, ignoring the fact that the jury found for Passantino on her state retaliation claim. CPI's suggested allocation would partially nullify the jury's state law determination, by effectively subjecting the entire compensatory award to Title VII's cap. We have held, under similar circumstances, that compensatory damages allocated by the court to claims other than Title VII claims should not be subject to Title VII's cap. Pavon v. Swift Transportation Co., 192 F.3d 902, 910-11 (9th Cir. 1999). In Pavon, the plaintiff recovered damages in excess of $300,000 on discrimination claims under state law, Title VII, and S 1981. The district court allocated the damages in excess of $300,000 to the 1981 and state law claims. Id. Although the jury's verdict form, like the form in this case, did not differentiate among the claims in awarding damages, we rejected the argument that the entire award should be subject to Title VII's cap and upheld the district court's allocation method, noting that neither S 1981 nor Title VII was intended to force plaintiffs to choose between remedial statutes. We can find no relevant distinction between Pavon and the present case.
 
 
 46
 In addition to nullifying the state cause of action in this case and violating our rule in Pavon, CPI's allocation method would drastically curtail the ability of states to provide damage remedies greater than those authorized by Title VII. Such a rule would violate Title VII's explicit prohibition against limiting state remedies. See 42 U.S.C. S 2000e-7; Pavon, 192 F.3d at 911; Martini, 178 F.3d at 1349-50 (holding that "were we not to treat damages under federal and local law as fungible where the standards of liability are the same, we would effectively limit the local jurisdiction's prerogative to provide greater remedies for employment discrimination than those Congress has afforded under Title VII.")
 
 
 47
 Moreover, CPI's proposed allocation would conflict with the district court's generalobligation to preserve lawful jury awards when possible. The jury's entire compensatory damage award was lawful under state law, and its punitive damage award was lawful under federal law (subject to any constitutionally valid limitation imposed by the statutory cap). An allocation that would serve to reduce lawfully awarded damages would fail to respect the jury's verdict and conflict with the purpose and intent of one or both statutes. Thus, we hold that the district court's allocation decision was not an abuse of discretion, and furthermore that, in circumstances such as these, subjecting the whole damage award to Title VII's cap would be inconsistent with Title VII's provisions.
 
 VIII. DAMAGES
 
 48
 CPI argues that the district court erred in refusing to grant its motion for judgment as a matter of law, or in the alternative its motion for a new trial, because there was insufficient evidence to establish any of the damages. We review de novo the district court's decision to deny judgment as a matter of law. EEOC v. Pape Lift, Inc., 115 F.3d 676, 680 (9th Cir. 1997).[15] We hold that the district court committed no error in holding the evidence sufficient and denying the motions. As the damage awards involving backpay, front pay, and emotional damages were allocated to the state law claim, we analyze those awards under Washington law, and affirm. We discuss the punitive damages question separately below.
 
 A. Backpay
 
 49
 CPI claims that there was "no evidence" to support any backpay, let alone the $100,000 backpay award. This claim is without merit. At the least, the jury clearly was entitled to find that Passantino would have won a bonus trip, worth $12,000, had CPI not prevented her from receiving timely information. Moreover, the jury was entitled to believe Passantino's testimony that she would have received one of several National Account Manager positions for which she was qualified. Williams stated that she was clearly qualified for those positions as of 1993 (if not earlier), and such positions were available after she complained of discrimination. The actual amount awarded by the jury, $100,000, could easily be derived from Passantino's testimony estimating that she would have received between $130,000 and $200,000 more in salary had she been promoted to one of those positions.
 
 
 50
 CPI argues that Passantino's damage estimates cannot apply because they are based on the harm she suffered from discrimination, not retaliation. However, the fact that she gave those estimates in the context of a claim of discrimination is irrelevant. Even if the jury did not find that Passantino was denied promotions prior to her complaints, it obviously did find that CPI punished her in retaliation for those complaints. After she complained, Passantino went from being the most highly rated performer in her division to being not promotable beyond that position. Thus, the most plausible reading of the record in light of the jury's verdict is that the jurors believed Passantino was denied promotions because she complained. The change in her status regarding her promotability after the complaints strongly supports this finding. We cannot say that this conclusion is contrary to the clear weight of the evidence.
 
 B. Front Pay
 
 51
 CPI also argues that we should disallow the jury's $2 million front pay award as a matter of law. We disagree. First, under Washington law the jury has substantial autonomy when awarding front pay. See Lords v. Northern Automotive Corp., 881 P.2d 256, 266 (Wash. Ct. App. 1994) (striking down trial court decision limiting front pay to five years after termination). Front pay may be awarded whenever the antagonism between the plaintiff and her employer is such that it would be inappropriate to expect her to return to work. See Pannell v. Food Services of America, 810 P.2d 952, 966 (Wash. Ct. App. 1991) (holding that front pay issue is not too speculative to go to jury, and endorsing it as substitute for reinstatement, citing Ninth Circuit's decision in Cassino); Hayes v. Trulock, 755 P.2d 830, 834 (Wash. Ct. App. 1988) (describing front pay as substitute for reinstatement); Cassino v. Reichhold Chemicals, Inc., 817 F.2d 1338, 1347 (9th Cir. 1987) (upholding front pay award based on "some hostility" in spite of testimony that plaintiff and defendant were still friends); Thorne v. City of El Segundo, 802 F.2d 1131, 1137 (9th Cir. 1986). Here, there was ample evidence to support a finding that substantial hostility existed between Passantino and her employer, such that a front pay award was appropriate. If the jury believed, as we presume it did, that CPI retaliated against Passantino because of her complaints, they could easily have believed that it would be inappropriate for Passantino to continue working at CPI, particularly given her testimony that she could not continue to work there indefinitely because of the hostility created by her complaints and litigation.
 
 
 52
 CPI contends that no front pay award was justified because a front pay award must be based on a finding of constructive discharge. CPI cites Gomez v. Great Lakes Steel Division, 803 F.2d 250, 256-57 (6th Cir. 1986) for the proposition that lost wages cannot be recovered without a finding of constructive discharge. Of course, even if Gomez did support that rule, we would be bound by Washington's law and, by extension, our decision in Cassino. However, Gomez provides no support for the proposition that an award of front pay requires a finding of constructive discharge. That case merely describes requirements for finding constructive discharge, and does not mention front pay at all. See id.
 
 
 53
 CPI also argues, in the alternative, that the jury's front pay award was excessive and speculative. Under Washington law,
 
 
 54
 This court will not willingly assume that the jury did not fairly and objectively consider the evidence and the contentions of the parties relative to the issues before it. The inferences to be drawn from the evidence are for the jury and not for this court. The credibility of witnesses and the weight to be given to the evidence are matters within the province of the jury and even if convinced that a wrong verdict has been rendered, the reviewing court will not substitute its judgment for that of the jury, so long as there was evidence which, if believed, would support the verdict rendered.
 
 
 55
 Herring v. Dept. of Social and Health Services, 914 P.2d 67, 77 (Wash. Ct. App. 1996) (internal citations omitted) (holding that $500,000 award was within "the range" of the evidence).[16] Here, we find that the award was supported by the evidence.
 
 
 56
 At the time of the trial, Passantino was 43 years old, with an expected working life of 22 years to her normal retirement age of 65. She had 18 years experience at CPIand her annual salary in her Level 3 position with CPI at that time was $71,500. Evidence showed that if Passantino left CPI, her annual salary with a new employer would likely be $50-60,000. On the other hand, if her career had not been cut short by CPI's violations of Title VII, the jury could easily have concluded that she was on the path to upper executive management at Level 4 or above. Evidence presented at trial indicated that the compensation packages available to Level 4 managers included base salaries of $94,000, potential cash bonuses, stock bonuses of 4-7% of salary, and stock options worth 200-300% of salary.
 
 
 57
 As an example, Passantino testified that she was qualified for a position held by John Wernicki (a job that was falsely described to her as a lateral). Wernicki earned $140,000 in base salary double Passantino's pay, plus bonuses, stock options, and other perks. The difference between what Passantino earned at the time she was discriminated against (without even considering the pay cut she would have to take upon leaving) and what Wernicki earned over the 22 years of her expected work life adds up to a total of $1.54 million. That calculation does not include the cash bonuses, stock bonuses, or stock options worth two to three times her salary. Figuring in those amounts could obviously result in a total in excess of the jury's $2 million award.
 
 C. Compensatory Damages
 
 58
 CPI also challenges the district court's decision upholding the jury's compensatory damage award. CPI claims that the evidence of emotional damage arising from lost promotional opportunities can only be attributed to Passantino's gender discrimination claims. This argument is misguided. The jury could have found that Passantino suffered substantial emotional damage because of CPI's retaliation against her. Her "promotability" status within the company plummeted after she complained. She testified, and her husband and sister corroborated, that she experienced substantial anxiety as a result of her sense that she could no longer advance within the company. The jury could have attributed this anxiety, as well as her rashes, stomach problems, and other symptoms, to CPI's retaliatory action. While the jury could have believed, as CPI argues, that these problems were caused by her unwarranted perception that she suffered discrimination (or even some preexisting condition), we cannot reverse its findings merely because our reading of the evidence might have been different, especially where the district court concluded that the "evidence at trial was sufficient to support the verdict[ ] on emotional distress damages." Here, there is evidence which, if believed, would support the verdict. See Herring, 914 P.2d at 78.
 
 
 59
 CPI also appears to suggest that emotional damages awards must be supported by some kind of "objective" evidence. While objective evidence requirements may exist in other circuits, such a requirement is not imposed by case law in either Washington, the Ninth Circuit, or the Supreme Court. See Herring, 914 P.2d at 77-83 (upholding damage award in excess of $1,000,000, including $550,000 for emotional damages, in disability discrimination and retaliation case based on testimonial evidence of emotional harm); Chalmers, 762 F.2d at 761 (upholding emotional damages based solely on testimony); Johnson v. Hale, 13 F.3d 1351, 1352 (9th Cir. 1994) (noting that emotional damages may be awarded based on testimony alone or appropriate inference from circumstances); Carey v. Piphus, 435 U.S. 247, 264 n.20 (1978) (noting that emotional distress damages are "essentially subjective" and may be proven by reference to injured party's conduct and observations by others). See also Merriweather v. Family Dollar Store, 103 F.3d 576, 580 (7th Cir. 1996) (noting that plaintiff's testimony can be enough to support emotional damages). Most important, Washington law containsno severity requirement as a precondition to awarding compensatory damages; thus, Passantino's testimony corroborated by that of her husband and sister is adequate to support the jury's verdict. Herring, 914 P.2d at 81.
 
 
 60
 CPI also argues that the Fourth Circuit ruled against substantial compensatory damages in a case extremely similar to this one, citing Hetzel v. County of Prince William, 89 F.3d 169, 171 (4th Cir. 1996). First, Hetzel is distinguishable. In Hetzel the plaintiff offered no corroborating evidence for her emotional damages, and she sought no counseling from anyone. Here, in contrast, Passantino's claims were corroborated by her husband and sister, and she sought help from her pastor. Second, the Fourth Circuit's holding does not bind us, even when we are applying federal law, let alone when it is Washington law that guides us. We find no basis under Washington law for reversing the district court's decision.
 
 D. Punitive Damages
 
 61
 CPI argues that the district court erred in upholding the punitive damages award, because no federal compensatory or nominal damages were awarded and therefore the punitive damages cannot stand under federal law. In addition, it argues that allowing the jury to consider punitive damages was error because there was insufficient evidence to submit the issue to the jury. Passantino argues, on cross-appeal, that the application of Title VII's $300,000 damages cap violates the Seventh Amendment. CPI responds that the cap is constitutional, and that in any event the punitive damages award is excessive under BMW of North America v. Gore, 517 U.S. 559 (1996)[17].
 
 
 62
 Although we conclude that the evidence was unquestionably sufficient and that the form of the jury's verdict properly supported a punitive damages award, we remand so that the district court may apply the Supreme Court's decision in Kolstad v. American Dental Association, 119 S.Ct 2118 (1999) -specifically so that the district court may determine whether CPI is entitled to present the vicarious liability defense outlined in Kolstad, and if so, for a new trial on punitive damages. For this reason, we need not reach either cross-appeal issue, as both of them concern the amount of the punitive damages award.[18] Because we do not reach the issue, although raised to us on appeal, Passantino is not foreclosed from seeking reconsideration before the district court or on further appeal to this court if it becomes appropriate to do so.
 
 
 63
 1. The Award of Federal Compensatory Damages
 
 
 64
 CPI argues that because the non-punitive damages were all allocated to the state claim, the punitive damages award under Title VII should not have been upheld. In support of its argument, it cites the jury instructions, which stated that under Title VII a plaintiff may not recover punitive damages without establishing liability for either compensatory or nominal damages.
 
 
 65
 We have held in S 1983 cases that punitive damages may be awarded in the absence of compensatory or nominal damages, as long as the plaintiff has shown that the defendant violated a federally protected right. Gill v. Manuel, 488 F.2d 799, 802 (9th Cir. 1973); Bise v. Int'l Brotherhood of Electrical Workers, 618 F.2d 1299, 1305-06 (9th Cir. 1979). Other circuits have adopted the same rule. See,e.g. King v. Macri, 993 F.2d 294, 297-98 (2d Cir. 1993); , Basista v. Weir, 340 F.2d 74, 88 (3rd Cir. 1965)[19].
 
 
 66
 Here, we need not decide if punitive damages may be awarded under Title VII in the absence of a compensatory or nominal damage award, because the jury did award compensatory damages. As we explained in our discussion of the district court's allocation decision, supra, Passantino did establish liability for compensatory damages on her federal claim, and the jury actually awarded her compensatory damages under federal law. It did so in the form of a general compensatory damages award that applied to both the federal and state claims. Because the standards for liability under state and federal law were similar, the damage awards were fungible and, barring some statutory or other reason (see p. 31 supra), could be allocated, by the court, to either the state or federal claims, in whole or in part. Although the district court acted properly in allocating the compensatory part of the jury's damage award to Passantino's state law claim, the fact remains that the jury awarded compensatory damages under both federal and state law retaliation claims. That is all that is required to permit an award of punitive damages in cases in which predicate damages are necessary. A court's subsequent allocation of compensatory or nominal damages among various claims does not change that rule. Moreover, in the present case, it is clear that the jury thought it was, inter alia, awarding federal damages, because it was told that it could not award punitive damages without awarding federal damages, and it did award punitive damages. Accordingly, the compensatory damages are adequate to sustain the award of punitive damages, if such predicate damages are required.
 
 2. Sufficiency of the Evidence
 
 67
 The standard for determining when evidence is sufficient to present the punitive damages issue to the jury is now governed by Kolstad v. American Dental Asociation, 119 S.Ct 2118 (1999). In that case, the Supreme Court rejected the District of Columbia Circuit's interpretation of Title VII, which would have required "egregious" conduct by an employer before punitive damages could be available. Id. at 2124. Instead, the Court stated that an employer may be liable for punitive damages in any case where it "discriminate[s] in the face of a perceived risk that its actions will violate federal law." Id. at 2125. The court made clear that although egregious conduct could be evidence of evil intent, such conduct was not required to establish punitive damages liability. Id. at 2126 (holding that egregious behavior provides "one means" of satisfying plaintiff's burden of proof for punitive damages). Thus, in general, intentional discrimination is enough to establish punitive damages liability.
 
 
 68
 However, the Court also acknowledged that there could be some instances in which intentional discrimination did not give rise to punitive damages liability. The Court set forth three areas in which the fact finder could find intentional discrimination but the defendant would nonetheless not be liable for punitive damages. First, if the theory of discrimination advanced by the plaintiff was sufficiently novel or poorly recognized, the employer could reasonably believe that its action was legal even though discriminatory. Second, the employer could believe it had a valid BFOQ defense to its discriminatory conduct. Third, in some (presumably rare) situations, the employer could actually be unaware of Title VII's prohibition against discrimination. Id. at 2125. Common to all of these exceptions is that they occur when the employer is aware of the specificdiscriminatory conduct at issue, but nonetheless reasonably believes that conduct is lawful. Under such circumstances, an employer may not be liable for punitive damages.
 
 
 69
 An application of Kolstad's intentional discrimination requirement to the facts here leaves no doubt that punitive damages were available. The jury had substantial evidence based upon which it could find malice or reckless indifference to Passantino's federally protected rights. The jury could have found that CPI downgraded Passantino's promotability status and offered her demotions in retaliation for her complaints. The jury also could have found that defense witnesses lied (both to Passantino and at trial) about their actions, as part of a continuing effort to cover up their campaign against her, including giving her false or misleading information about potential jobs as well as about salaries, and that its actions against Upshaw suggested a pattern of similar action. These actions are sufficient to permit a jury to conclude that CPI could not have reasonably believed that its conduct was lawful. As the exceptions outlined in Kolstad are not applicable here, there was sufficient evidence to submit the claim for punitive damages to the jury.
 
 3. Vicarious Liability
 
 70
 In addition to clarifying the standard for intentional discrimination claims under Title VII, Kolstad also expanded the availability of the Burlington defense to punitive damage claims. Defendants may now establish an affirmative defense to punitive damages liability when they have a bona fide policy against discrimination, regardless of whether or not the prohibited activity engaged in by their managerial employees involved a tangible employment action. While Burlington had created a similar affirmative defense for hostile work environment claims, Kolstad extends the doctrine by allowing defendants to assert it in response to punitive damages claims, even in cases involving tangible employment action. Kolstad, 119 S.Ct. at 2129-30.
 
 
 71
 In light of the facts before us, we considered undertaking the task of determining whether Kolstad applies. However, the parties had no reason to litigate the issues involved in a Burlington defense, leaving the record unclear to us in at least two material respects. First, while the actors here were clearly managerial, it is not apparent to us exactly how senior they were. We are not aware of any evidence that establishes how high up in CPI's corporate structure Williams, the supervisor of a "National Account Manager," and Hogan, a "Vice President of Sales" actually were. A determination regarding the status of the principal actors is crucial to the outcome, for while Kolstad established that, under some circumstances, corporations may not
 
 
 72
 be subject to punitive damages for actions taken by their "managerial" employees, it did nothing to eliminate the rule established in earlier cases that an individual sufficiently senior in the corporation must be treated as the corporation's proxy for purposes of liability. See, e.g., Faragher v. City of Boca Raton, 118 S.Ct 2275, 2284 (1998) (citing Harris v. Forklift Systems, 510 U.S. 17, 19 (1993)).
 
 
 73
 In fact, Kolstad makes it clear that the proxy doctrine constitutes a bar to the successful invocation of the Burlington defense as to punitive damages. In Kolstad, the plaintiff, Carole Kolstad, was denied a promotion within the American Dental Association because of her sex. The people primarily responsible for her failure to receive the promotion were William Allen, who was the acting executive director of the Association, and Leonard Wheat, who was the acting head of the Washington office where Kolstad worked. 119 S.Ct. at 2122.
 
 
 74
 After announcing that the standard governing the availability of punitive damages in Title VII cases requires proof of "malice or reckless indifference" to the rightsguaranteed by Title VII, the Court discussed how the district court should apply the standard on remand. For Allen, the Court stated that because he held the highest position within the Association, the only question for the district court would be whether or not he acted with malice or reckless indifference. For Wheat, the Court noted that the district court would have to determine whether or not Wheat served in a "managerial capacity" and whether or not he behaved with "malice or reckless indifference." Id. at 2130.
 
 
 75
 Thus, the Burlington defense remains inapplicable as a defense to punitive damages when the corporate officers who engage in illegal conduct are sufficiently senior to be considered proxies for the company. If Hogan and Williams hold positions sufficiently high up within CPI, they would be CPI's proxies, which would bar CPI from asserting a vicarious liability defense to punitive damages. This is one of the matters for the district court to examine upon remand.
 
 
 76
 Second, the record does not contain enough information about CPI's anti-discrimination policy to allow us to determine whether it was implemented in good faith. As Kolstad makes clear, even if the defendant shows that the relevant actors were merely managerial, it can escape punitive damages only if it has undertaken sufficient "good faith efforts at Title VII compliance." Kolstad, 119 S.Ct. at 2129.[20] Although the purpose of Title VII is served by rewarding employers who adopt anti discrimination policies, see id., it would be undermined if those policies were not implemented, and were allowed instead to serve only as a device to allow employers to escape punitive damages for the discriminatory activities of their managerial employees. Thus, to avail itself of a Burlington defense, an employer must show not only that it has adopted an anti-discrimination policy, but that it has implemented it in good faith.
 
 
 77
 While the record reflects that CPI had promulgated a policy against workplace discrimination and a complaint mechanism to which Passantino turned, CPI did not, understandably (given the then-current state of the case law) introduce the requisite evidence establishing that the policy was fairly and adequately enforced. To the contrary, Passantino testified that the policy and mechanism were not enforced and were used to discourage her from asserting her rights. Unless the district court is able to determine from the record that one of the individuals responsible for the acts of retaliation is a proxy for CPI, the proxy issue and the issue of whether CPI's anti-discrimination policy and mechanism meets the good faith standard will be subject to resolution only following the introduction of further evidence on remand[21].
 
 
 78
 Because we remand for consideration of whether punitive damages are available under the circumstances of this case, we do not reach the question of the constitutionality of Title VII's damage cap. See Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). Because we do not reach the issue, although raised to us on appeal, Passantino is not foreclosed from seeking reconsideration before the district court or on further appeal to this court if it becomes appropriate to do so.
 
 IX. ATTORNEYS' FEES
 
 79
 CPI argues that Passantino's counsel's fees should be reduced becausePassantino did not prevail on some of her claims. We review a fees award for abuse of discretion, and review the legal analysis involved in the award de novo. Cabrales v. County of Los Angeles, 935 F.2d 1050, 1052 (9th Cir. 1991). The prevailing party is entitled to reasonable attorneys' fees if she succeeds on "any significant issue in litigation which achieves some of the benefit" of her suit. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). The district court did not abuse its discretion.
 
 
 80
 Although Passantino did not prevail on her discrimination claims or her claim for injunctive relief, she prevailed on her retaliation claims, which were inextricably intertwined with her discrimination claims. In fact, in order to prevail on her retaliation claims, she had to prove that she reasonably believed that CPI was engaged in discriminatory activity. Moyo v. Gomez, 32 F.3d 1382, 1384-85 (9th Cir. 1994). Thus, the time spent on her discrimination claims contributed to the success of her retaliation claims. Cabrales, 935 F.2d at 1052. Her multimillion dollar verdict represented success on a significant issue which achieved a substantial portion of the benefit sought from the suit. Given the broad discretion to which attorneys' fees determinations are entitled on appellate review, Hensley, 461 U.S. at 437, we decline to second-guess the district court's decision.
 
 X. CONCLUSION
 
 81
 For the foregoing reasons, we affirm the district court's judgment and jury's award of compensatory damages, front pay, and back pay to Passantino. We vacate the punitive damages award against CPI and remand for the district court to apply the Supreme Court's decision in Kolstad. If necessary, the district court should conduct a trial on the punitive damages issue.
 
 
 82
 AFFIRMED IN PART; VACATED AND REMANDED IN PART.
 
 
 
 Notes:
 
 
 [1]
 Williams testified at trial that although he believed the men complained of bore equal responsibility for the problems between them and Passantino, he did not give them a reduced performance rating for relationship with peers.
 
 
 [2]
 In contrast, the male colleagues Passantino and Upshaw complained about were promoted.
 
 
 [3]
 Upshaw also had a "follow-up" meeting with Hogan at which she was told that her male colleagues were better paid than she was. In fact, Upshaw was informed by Hogan that her pay was not even within the appropriate range for her position even though she had been in that position for five years.
 
 
 [4]
 At her performance review held in 1996, Passantino asked Hogan about a position that in fact would have been a promotion, Director of Trade Marketing. The company's failure to promote Passantino to this position was one of the allegations of discrimination in her EEOC complaint. Hogan characterized it as a lateral, telling Passantino that it was at the "same level" she currently held, Level 3, and that it was "not a promotion from where you're at today." Corporate records showed that the job was actually Level 4. This meeting was tape recorded by both Passantino and Hogan, but CPI's tape was apparently inaudible. Passantino produced her copy of the tape during discovery. During his direct examination, Hogan testified accurately that the position would have been a promotion. After an unsuccessful attempt by CPI's counsel to prevent the jury from hearing the tape, Hogan was impeached with it; it showed him misrepresenting the nature of the position to Passantino and telling her it was at the "same level." Hogan was thus forced to admit on the stand that his statement to Passantino was false. The district court stated that Hogan and Williams "were probably viewed by the jury as being caught in lies, having demeanors of untruthfulness, lacking credibility."
 
 
 [5]
 Title VII limits compensatory and punitive damages based on the size of the defendant corporation. For a plaintiff suing CPI, a company with more than 500 employees, damages are capped at $300,000. 42 U.S.C. S 1981a(b)(3). Backpay does not constitute damages for purposes of the cap. 42 U.S.C. S 1981a(2).
 
 
 [6]
 We note that venue is based on the allegations set forth in the complaint, not solely on the counts on which a plaintiff prevails. Passantino alleged a variety of acts, both of discrimination and retaliation, in addition to the actual failure to promote. For purposes of venue, we can consider any of those actions. However, because she worked out of a home office, it is likely that none of the decisions to engage in unlawful actions against her occurred in Washington.
 
 
 [7]
 Only the first of the possible bases for venue is at issue here.
 
 
 [8]
 Although we recognize that the issues involved in personal jurisdiction disputes are different from the issues involved in venue disputes, it is clear that if exercising personal jurisdiction over a particular defendant would comport with due process, this fact provides support for reading an otherwise ambiguous venue statute in harmony with the jurisdictional rule.
 
 
 [9]
 For example, CPI's reference to decreased inventory obviously does not provide a sufficient explanation for all of Passantino's information problems. While there was testimony that information problems occurred throughout the division, that testimony was from Hogan, who was severely discredited at trial. Williams' explanations are problematic for the same reason.
 
 
 [10]
 We need not consider whether or not Burlington's defense could ever be available in retaliation cases, even in those cases which do not involve tangible employment actions.
 
 
 [11]
 While an employer is always liable for tangible employment actions taken in its name, it does not follow that employers are always subject to punitive damages for tangible employment actions by their employees, because there may be reasons to limit damages when companies engage in good faith efforts to comply with Title VII, even if they ultimately fail to prevent discriminatory conduct by their managerial employees. We discuss this issue in detail in the punitive damages section of this opinion, which considers the effect of Kolstad v. American Dental Association, 119 S.Ct. 2118 (1999). See section VIII D., infra.
 
 
 [12]
 We note that CPI did not argue below that the District Court's decision was inconsistent with Monessen.
 
 
 [13]
 This is also the rule in the Ninth Circuit. See Alma v. Manufacturers Hanover Trust Co., 684 F.2d 622, 626 (9th Cir. 1982).
 
 
 [14]
 Wholly aside from the allocation issue, CPI's argument that the front pay award is subject to the cap is erroneous. Front pay is not part of the compensatory award for purposes of Title VII's damage cap. Gotthardt v. National Railroad Passenger Corp., 191 F.3d 1148, 1155 (9th Cir. 1999). Backpay is also excluded. See 42 U.S.C. S 1981a(b)(3). Thus, those parts of the award are not subject to the cap, whether or not the allocation was appropriate.
 
 
 [15]
 Judgment as a matter of law is only appropriate if the evidence, viewed in the light most favorable to the nonmovant, permits only one decision, which is contrary to that reached by the jury. Forrett v. Richardson, 112 F.3d 416, 419 (9th Cir. 1997). A district court's refusal to grant a new trial should be reversed only if it constitutes an abuse of discretion. Wharf v. Burlington Northern R.R. Co., 60 F.3d 631, 637 (9th Cir. 1995). The trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice. Ace v. Aetna Life Ins. Co., 139 F.3d 1241, 1248 (9th Cir.), cert. denied, 119 S.Ct. 338 (1998).
 
 
 [16]
 Similarly, Ninth Circuit law provides for "substantial deference" to a jury's findings as to the appropriate amount of damages. Del Monte v. Monterey, 95 F.3d 1422, 1435 (9th Cir. 1996). A jury's award of damages should not be disturbed unless it is clearly unsupported by the evidence. Chalmers v. City of Los Angeles, 762 F.2d 753, 760 (9th Cir. 1985).
 
 
 [17]
 To the extent that CPI's argument can be read to challenge the capped punitive damage award of $300,000 as excessive, we reject its argument. As we uphold the compensatory award of $1,000,000, there is no doubt that the capped punitive damages are not excessive.
 
 
 [18]
 The cap was applied only to Passantino's punitive damages award.
 
 
 [19]
 The First Circuit held, however, in a case in which it did not discuss any of the cases noted above, that compensatory or nominal damages were required in a Title VII case. Kerr-Selgas v. American Airlines, 69 F.3d 1205, 1214 (1st Cir. 1995) (requiring compensatory or nominal damages for award of punitive damages).
 
 
 [20]
 For this reason, the Court stated that the Association's good faith efforts "may" be relevant to determining liability for Wheat's actions, while it did not mention those efforts when discussing the possibility of liability for Allen's actions. As Allen was without doubt a proxy for the Association, it could not escape punitive damages liability for its proxy's actions by relying on its anti-discrimination policy. Kolstad, 119 S.Ct. at 2130.
 
 
 [21]
 It is, of course, never necessary to reach the "good faith" compliance with Title VII issue if it is determined that the discriminatory action was committed by a "proxy." Kolstad, 119 S.Ct. at 2129-30.
 
 
 
 83
 Passantino v. Johnson & Johnson; Nos. 97-36191 and 98-35036
 
 
 84
 THOMAS, Circuit Judge, concurring in part and dissenting in part:
 
 
 85
 I would affirm the district court judgment in its entirety. In my view, the evidence was sufficient to support a punitive damage award even under Kolstad v. American Dental Ass'n, 119 S. Ct. 2118 (1999). I would also hold that the Title VII limitation on damage awards does not violate the Seventh Amendment. Thus, I do not believe any remand is required.
 
 
 86
 In all other respects, I concur in the majority opinion.