# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2853

_____

Sheri Sawyer Madison,                    *
                                         *
          Appellee,                      *
                                         *
     v.                                  *
                                         *
IBP, Inc.,                               *
                                         *
          Appellant.                     *
                                         *

_____

No. 99-2859

_____

Sheri Sawyer Madison,                    *
                                         *
          Plaintiff-Appellant,           *
                                         *
United States of America,                *
                                         *
          Intervenor Below-Appellee,     *
                                         *
     v.                                  *
                                         *
IBP, Inc.                                *
                                         *
          Defendant-Appellee.            *

Appeals from the United States
District Court for the
Southern District of Iowa.

_____

Submitted:  December 14, 2000

Filed:  June 25, 2001 (corrected 7/2/01)

_____

Before McMILLIAN and MURPHY, Circuit Judges, and BOGUE,[1] District Judge.

_____

MURPHY, Circuit Judge.

Sheri Sawyer Madison, a Caucasian women married to an African American man, brought this case against IBP, Inc. (IBP) for sex and race discrimination and harassment, retaliation, and constructive demotion, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq.; 42 U.S.C. § 1981; and the Iowa Civil Rights Act (ICRA), Iowa Code § 216. Her claims grow out of her employment at IBP's meatpacking plant in Perry, Iowa.

After a four week trial, the jury returned a verdict in favor of Madison, awarding her backpay, benefits, and compensatory and punitive damages. The district court applied 42 U.S.C. § 1981a(b)(3) to reduce the damage award, and both Madison and IBP filed post judgment motions. The district court denied Madison's motions for restoration of her damage award, front pay, and other equitable relief; it granted her motions for reallocation of damages, attorney fees, costs, and interest. The court denied IBP's motions for judgment as a matter of law, to alter or amend the judgment, and for a new trial. It then ordered the entry of an amended judgment against IBP.

Both parties appeal. IBP does not contend that Madison failed to present sufficient evidence of racial and sexual harassment, discrimination, retaliation, constructive demotion, or vicarious liability, but it contests the amount of emotional distress damages, the award of punitive damages, the admission of evidence of discrimination and harassment of other employees, the jury instructions on the period for which Madison could recover damages, and the way in which the district court applied § 1981a(b)(3). On her cross appeal, Madison challenges the court's reduction

---

[1]The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

of the amount awarded by the jury and the constitutionality of § 1981a(b)(3). The United States intervened in the district court to uphold the statute and does so again in this court. We affirm the award of backpay, benefits, and compensatory damages, but we vacate the award of punitive damages and remand.

I.

IBP, the world's largest producer of beef and pork products, opened a hog processing plant in Perry, Iowa in 1989 and hired Sheri Sawyer Madison as a meatcutter. The Perry plant is divided into three sections: the kill floor, where hogs are killed; the cut floor, where workers split the hog carcasses; and the converting floor, where workers trim the meat and bones from the carcasses. The sections are organized into numerous production lines, each of which is responsible for a different facet of hog processing. The lines are composed of line workers, utilities, and trainers. Utilities and trainers must be familiar with all aspects of the line jobs since utilities substitute for absent workers and trainers teach new workers how to perform various line functions. A utility position is usually the first step towards promotion to such management support jobs as trainer. The lines are managed by front line supervisors and general supervisors. A training coordinator supervises the trainers. Supervisors are managed by plant superintendents, who are responsible for all production functions, and by the plant manager, who is the highest level manager in the plant. The Perry plant also employs a personnel director who is responsible for addressing employee grievances, conflicts, and disciplinary matters. The authority to terminate employees is vested in the plant manager and the personnel director.

Madison went to work in 1989 as a meatcutter on the cut floor's jowl line, where her responsibilities included trimming meat from the neck and jowls of hogs. At the time she started, she was dating James Madison, an African American man who was also employed at the Perry plant. The couple married in 1996 and have two children, James Jr. and Whitney. The uncontroverted evidence of her coworkers and supervisors indicates that Madison had excellent knife skills, produced a quality meat product, and was a reliable worker.

Madison presented a great deal of evidence at trial to show that she was subjected to a continuing pattern of racial and sexual harassment during her employment and that supervisors and managers failed to take action in response to her complaints. There was also evidence that supervisors often witnessed acts of harassment towards Madison and that some of them participated in these acts. Madison also introduced evidence from which the jury could find that in making promotion decisions IBP had discriminated against her because of her gender and because she was involved with an African American man and had biracial children. In addition, she produced evidence that she was retaliated against and was forced to take more than one constructive demotion in order to escape discrimination and harassment.

From the evidence the jury could and did find that IBP maintained at the Perry plant a hostile work environment for women and for workers in interrracial relationships and that Madison's civil rights were regularly violated up to, and even after, the time she filed this action in 1996. There was evidence that Madison was physically harassed on many occasions -- that other workers grabbed her buttocks, rubbed up against her, and picked her up and carried her around. Line workers frequently made vulgar remarks about women in her presence and were almost never disciplined for them, even though many of the remarks were made in front of supervisors. General supervisor Larry Sippel referred to female employees as "whores" and "dykes" and stated that "women don't belong in packinghouses." Coworker Bill Teeples questioned why she was "with a fucking nigger" and said that "niggers and whites should stay with their own." Fellow line worker Gary Laird made racist comments about Madison's relationship and her two children. Gary asked Madison what she was "doing with a fucking nigger having fucking nigger babies," and told her that she had "ruined herself" by having children with an African American man. Gary's brother Gordy was a general supervisor, and Gary often made these racial comments in the presence of Gordy and general supervisor Sippel. Neither supervisor intervened in any way to stop the verbal harassment, even when Gary's comments caused Madison to leave the line crying. Gary continued to harass Madison and her family whenever he saw them until as late as 1998.

-4-

The jury could and did find that the promotion system was controlled by biased decisionmakers who discriminated against Madison because she was a woman and because she was involved in an interracial relationship. Although supervisors do not directly make promotion decisions, most decisions are based on their recommendations. There was evidence that many of Madison's supervisors had negative views about the ability of women to work on the line and that they interfered with her attempts to learn different jobs in order to improve her chances for promotion. General supervisor Larry Sippel told Madison that women "can't do physical jobs," and another general supervisor, Gordy Laird, told Madison that she could not learn to skin hams because "that's a man's job." Madison nevertheless learned how to skin hams and testified at trial that this job was one of her favorites. When Madison asked to switch assignments to learn shank boning, supervisors John McNamara and Eugene Jackson told her that shank boning was a "man's job" and that women were not capable of doing it. They only permitted her to switch jobs if she were certified by a trainer. Certification was not typically required of male workers, and she experienced a substantial delay in receiving a pay increase because she was required to go through a certification process.

Line workers can advance at IBP to utility, trainer, and higher management jobs by applying for open positions. After gaining expertise on the line, Madison expressed interest in being promoted. She applied for, and was denied, at least nine different promotions by December 1993. She was often passed over in favor of male employees with less job knowledge and seniority. In November 1993, Madison applied for a utility position which was eventually awarded to a male coworker. Supervisor McNamara approved the appointment of the male employee without investigating the personnel files of both candidates, proceeding instead on the basis of recommendations by Jackson and other supervisors. Madison was told that her coworker received the job because he had better knife skills, more seniority, a better attendance record, and greater job knowledge. She subsequently filed a sex discrimination grievance with the union. When management reviewed both personnel files in response to the grievance, it discovered that the male employee actually had a significant discipline and absentee record. The manager who resolved the grievance found that Madison was qualified for the job and recommended that she receive the next vacant trainer position.

-5-

In December 1993, Madison applied for and received the next open trainer position and became the plant's first female trainer on the cut floor. Eugene Jackson was her supervisor on this job. Jackson, an African American man, told her that he did not believe "the races should mix" and that she should not expect to receive favorable treatment from him because she was dating an African American. Jackson regularly assigned Madison to less desirable jobs on the line and refused to let her perform her trainer duties. Madison reported Jackson's actions to Training Coordinator Mike Miller, to Assistant Personnel Director Sue Menhusen, and to Personnel Director Alberto Olguin. Olguin testified at trial that Jody Schick, Madison's line supervisor, had told him that he had heard that Jackson did not like Madison because of her interracial relationship. Jackson denied the truth of Schick's report, and no disciplinary action was taken against him and management did not retain records to reflect any investigation by Olguin.

In her work as a trainer, Madison was physically and verbally harassed by line workers on a daily basis, often in the presence of floor supervisors Jackson and Schick. Line workers repeatedly referred to Madison as "bitch" and "whore" and asked her to perform sexual acts on them. Some physically grabbed her, shoved her, and rubbed their bellies and genitals up against her. Despite Madison's repeated complaints to line supervisors and her requests for their assistance, they did nothing to stop the abuse.

Madison complained to Training Coordinator Mike Miller about the harassment and the lack of response from her supervisors. Miller spoke to the line workers about their conduct, but he did not discipline any of them or see that references to her complaints were recorded in their personnel files. Miller later expressed his view to general supervisor John McNamara that Madison had willingly engaged in horseplay and "grab ass" with the line workers. Miller acknowledged at trial that he himself had never seen her do anything of the sort, but that line worker Lisa Renmark had said she did. Miller admitted that he never questioned Madison about Renmark's remarks, nor did he ever investigate whether Madison had actually engaged in such horseplay. When floor supervisors Jackson and Schick learned that Madison had complained to

Miller, they became angry and threatened that they could "make her life miserable" if she made further reports.

Madison continued to experience harassment and to report it without any responsive action by supervisors or managers. In February 1994, Madison informed the general supervisor that a line worker had shoved her, screamed an obscenity at her, and refused to return to his work station. The floor supervisor did nothing in response other than to tell her that she needed to "take care of [herself]" and that dealing with these incidents was just "part of being a trainer." Later that year Madison reported to Training Coordinator Mike Miller that three male line workers were repeatedly touching her in an offensive way and that her line supervisors had seen another worker grab her buttocks on numerous occasions but had done nothing to stop it or to discipline him. Miller took no action in response to these complaints, but Jackson made Madison perform utility tasks instead of her trainer duties when he learned she had complained.

Madison went to Personnel Director Alberto Olguin, the person with overall responsibility in the IBP plant for investigating employee complaints, and reported that she was being harassed and discriminated against because of her sex and her interracial relationship. She requested a transfer to the day shift. Although Olguin and Training Coordinator Miller were both aware that Madison was seeking the transfer because she was being harassed in her current job, the only investigation they conducted was to ask Jackson, one of those accused, whether Madison had been harassed or discriminated against and whether she should be transferred. Jackson denied that there were any such problems but said that Madison should be allowed to transfer. Management did no further investigation of Madison's harassment complaints.

Madison's transfer request was approved, and she was assigned to work on the day shift under supervisor Gordy Laird. Although Madison believed that she would be performing trainer duties on this shift, Laird informed her that he did not want her working as a trainer. He instead assigned her to utility duties on the cut line, where she was verbally harassed on a daily basis, often in front of supervisors. When Madison

complained about the constant abuse to the general supervisor, he told her that if "you want to be a supervisor, this is what you've got to put up with sometimes." He also suggested that she might be "intimidating" to Asian male workers, that she should defer to them in training, and that she should keep in mind that women walk behind men in Asian cultures. Assistant Personnel Director Sue Menhusen told Madison to act "respectful" to Hispanic males because they might not have had much experience in receiving instructions from a woman.

Madison continued to bid for open management support jobs, but she was passed over in favor of male employees, including one who had been fired three years earlier for excessive absenteeism. In December 1994, Madison asked to downbid to a lower paying utility position on the cut floor, citing constant harassment and lack of support from her supervisors. Her general supervisor told her that he would never promote her again if she relinquished her trainer job. Although Madison informed Personnel Director Olguin and Plant Manager Larry Moser that she was downbidding because of sexual harassment, there was no evidence that IBP investigated her allegations.

Evidence showed that coworker harassment continued after Madison constructively demoted to the cut floor, as did management's failure to stop it. From December 1994 until at least March 1996, line workers regularly threw hog clots at her, grabbed her buttocks and breasts, rubbed up against her, and called her derogatory names. She complained directly to the workers and also to her supervisors, who did nothing to intervene. Line worker Marcelino Alarcon frequently picked her up against her will and carried her around the work area. When Madison asked her supervisors to "get him away from me," they only told Alarcon to stop the "horseplay" and took no other action. On another occasion, her supervisor just laughed when Madison asked him to stop Alarcon's physical harassment. Alarcon was never disciplined for his conduct. General supervisor Gordy Laird told Madison that if she continued to complain about harassment by line workers, he would discipline her for having started it. He also told her that he would write up a disciplinary report against her for every complaint she made against a male worker and that this would eventually result in her termination. Madison complained in 1996 to Plant Manager Moser that Alarcon was

picking her up against her will and carrying her around. Moser responded that the world was not perfect and that she would have to "deal" with such behavior if she wanted to be a manager.

In addition to being sexually harassed, Madison also experienced harassment based on race after she downbid in 1994 and began working again with Gary Laird. Gary continued to harass Madison about her children. He asked how she could "take them fucking niggers to the grocery store" and stated that he would "be embarrassed toting them fucking niggers around." He called her children derogatory names and suggested to other coworkers that they could care for Madison's children by "lick[ing] their lips and stick[ing] them on the wall" and "let[ting] them jump on the bed and put[ting] velcro on the ceiling." He talked this way to Madison, and her family and friends told her about similar comments that he made to them.

Madison and two coworkers complained about Gary's conduct to her supervisors and to Personnel Director Olguin. No action was taken to discipline Gary or to stop his behavior. According to IBP, Gordy Laird told Gary in 1995 to stay away from Madison and her family, but no reference to such an instruction was placed in Gary's personnel file until after his deposition was taken by Madison's counsel in 1998. Management also never followed up to determine if Gary had in fact ceased the harassment. In his 1998 deposition, Gary admitted that he had continued to make racist remarks to Madison and her family right up until the date of the deposition. In addition to calling her children derogatory names, he also expressed his belief that "niggers are only good for welfare and prison." Madison often left the line in tears as a result of Gary's behavior.

In January 1995, Madison filed a civil rights complaint with the Iowa Civil Right Commission (ICRC), alleging sexual discrimination and harassment. She amended the complaint in April 1996 to include racial discrimination and harassment. The ICRC hosted a mediation session in an attempt to resolve Madison's complaint. High ranking members of IBP management, including plant Personnel Director Olguin and corporate EEO Coordinator Bernielle Ott, were present at the meeting. Although Madison

described numerous incidents of discrimination and harassment to which she had been subjected at IBP, the managers who were present did not undertake an investigation of her allegations. There was evidence that even after Madison filed her ICRC complaint, she was repeatedly and unfairly disciplined by her supervisors.

Meanwhile, Madison continued to bid unsuccessfully for vacant supervisory positions. There was evidence that the posts were usually awarded to males with less seniority, less experience, and poor personnel records. The various reasons management gave for not promoting her were that she had a bad attitude, that she complained too much, and that she was not bilingual. After Madison complained in June 1995 about being passed over for a trainer position in favor of a male worker with less seniority and job knowledge, Plant Manager Moser told her that enduring racial and sexual harassment was part of being a manager. After her ICRC mediation session, Madison bid unsuccessfully for four more supervisory and management positions. One of these jobs was given to a male utility worker who had previously been on probation for attendance problems. She eventually stopped applying for promotions in July 1997, by which time she had unsuccessfully applied for at least 23 promotions. At the time of trial, Madison held the position of box room forklift operator. She had constructively demoted herself to this position in order to escape from the production line environment and because Training Coordinator Mike Miller had not allowed her to return to the night shift, despite his earlier assurance that she could.

Madison was subjected to unwanted physical and verbal harassment at least up until the time she filed this case in 1996. She was regularly grabbed, fondled, and called derogatory names, and her subsequent complaints to management were not investigated. In 1996 Madison went with two female coworkers and a union steward to report to Personnel Director Olguin that three male workers were harassing her and other women. Madison told Olguin that the men were calling the women vulgar names, grabbing them, molding hog fat in the shape of male sex organs and sending the pieces down the line, and starting rumors that several of the women were romantically involved with supervisor Godfrey. Olguin gave the three men verbal warnings for starting rumors about Godfrey. In 1997, Alarcon forcibly thrust Madison over a vat

-10-

and simulated an act of sodomy on her. Madison reported this assault to her supervisors, but they did nothing in response.

Madison presented evidence that the discrimination and harassment she faced at work resulted in severe emotional distress. She lost weight, broke out in hives, suffered from frequent headaches, and had trouble sleeping. Her relationship with her husband suffered, and the couple separated several times. She testified that the harassment and taunting made her feel hurt, humiliated, and degraded and that she often left the line in tears. Keith Ratliffe, a pastor and relative who had counseled her on at least four occasions, described Madison as depressed and emotionally drained.

IBP introduced evidence that it had a corporate policy prohibiting racial and sexual discrimination and harassment. The policy was explained to new employees during their orientation to the company. Each year the company EEO coordinator hosted a two hour training session for plant managers on the "Legal Aspects of Supervision." This session dealt with such issues as the corporate discrimination policy and how to address harassment complaints. IBP also maintained an affirmative action plan.

There was evidence that despite the existence of this policy, IBP maintained promotion and disciplinary procedures which discriminated against women and which failed to protect victims from harassment. Managers were instructed to send employees who complained of sexual harassment to the human resources department for counseling. Personnel Director Olguin stated that pursuant to IBP policy, he always informed an alleged harasser of the identity of the complainant, even though the company was aware that this could lead to retaliation. Labor Relations Manager Lonnie Jepson testified that he judged complaints by women workers about offensive conduct or language by whether the complainant had responded to the situation in the manner in which his wife would have. According to Jepson, women should "just walk away" if they are assaulted by a male coworker. Managers consistently told complainants to "just stay away" from their harassers or to "quit playing around."

Promotion decisions were made on the basis of recommendations by many individuals who, the evidence showed, were biased against women and racial minorities.

From approximately February 1994 until the time of Madison's trial in 1999, employees who complained of unlawful discriminatory treatment or harassment were asked to sign a form that resulted in a "counseling for sexual harassment" notation being placed in the disciplinary part of their personnel file.[2] Disciplinary reports are a factor in promotion decisions. The evidence showed that investigative reports about discrimination or harassment complaints were filed under either the complainant's name or the year, not under the name of the accused perpetrator. The company did not therefore have a readily available record of employees who had been accused of harassing other workers. The record also indicates that on at least fourteen occasions, a worker accused of offensive conduct was "counseled" for harassment, but nothing at all was recorded in his file.

Several other female employees testified that they too had been physically and verbally harassed by male coworkers and that supervisors had failed to investigate their complaints. Several women stated at trial that after they reported incidents of sexual harassment, they were unfairly disciplined and sometimes terminated. For example, Patricia Flannery complained in December 1996 that a coworker was harassing her. Ten days after she complained, Flannery was written up for insubordination by Personnel Director Olguin. She was fired three days later. Her supervisor stated on her termination report that there were "[t]oo much [sic] problems out of this employee."

---

[2]Rex Hofer, Personnel Director at the Perry plant from April 1992 to February 1994, testified that he did not ask complainants to sign the sexual harassment form or put counseling notations in their files because he believed that such procedures discouraged employees from submitting complaints. IBP reinstated its previous procedure after Hofer left his position.

Several African American employees testified about racist remarks made by coworkers and supervisors. The men's locker room contained graffiti, including gang signs, Ku Klux Klan signs, swastikas, and racially derogatory epithets. Madison worked for a time in the laundry room adjoining the locker room, and she complained in 1996 to a supervisor about the racially offensive graffiti there. The supervisor took no action to remove it.

## II.

Madison filed a sex discrimination charge against IBP with the Iowa Civil Rights Commission and the Equal Employment Opportunity Commission (EEOC) on January 13, 1995. She amended her charge on April 3, 1996, to include race discrimination.

On September 18, 1996, after receiving a right to sue letter from the EEOC, Madison filed this action. She claimed that IBP had maintained a hostile work environment in which she had been harassed because of her gender and her association with her husband and children. She also alleged that she had been discriminated against on the basis of sex and race, that she had been denied promotions to positions for which she was qualified, and that IBP had retaliated against her for complaining about discrimination and harassment by unfairly disciplining and refusing to promote her. Finally, Madison claimed that IBP had deliberately made her working conditions so intolerable that she had been forced to take constructive demotions in the attempt to escape the discrimination and harassment.

After a four week trial, the jury returned a verdict in February 1999 in favor of Madison. The jury awarded her a total of $76,667 in backpay and benefits,[3] $266,750 for past emotional distress,[4] and $2,069,000 in punitive damages.[5] The jury did not

[3]The backpay and benefits award included $50,688 for sex discrimination, $25,000 for retaliation, and $979 for constructive demotion.

[4]The compensatory damage award for past emotional distress included $110,000 for sex discrimination and harassment, $155,000 for race discrimination and

award any damages for future emotional distress or for past emotional distress for retaliation. It also did not award backpay and benefits for harassment or for race discrimination.

Before issuing an order for entry of judgment, the court received briefing and argument from the parties on the applicability of the Title VII damages limitation. That provision, 42 U.S.C. § 1981a(b)(3)(D), sets $300,000 as the maximum amount of Title VII damages that can be awarded against a defendant of IBP's size. The district court decided to apply the limitation provision to the jury awards for sex discrimination and harassment, reducing those damages from a total of $1,074,000 to $300,000.[6] The court rejected IBP's contention that the Title VII damages cap should also be applied to Madison's retaliation and constructive demotion claims. The court concluded that Madison had presented sufficient evidence to establish liability for retaliation and constructive demotion under either § 1981 or Title VII and that it therefore did not need to apply the latter statute's limitation provision to these awards. The court then ordered entry of judgment in Madison's favor in the amount of $1,638,417.[7]

Both sides filed timely post judgment motions. Madison asked the court to amend the judgment by restoring the full amount of damages awarded her by the jury, arguing that the Title VII damages limitation is unconstitutional. In the alternative, she

harassment, and $1750 for constructive demotion.

[5]The punitive damage award included $964,000 for sex discrimination and harassment, $930,000 for race discrimination and harassment, $150,000 for retaliation, and $25,000 for constructive demotion.

[6]42 U.S.C. § 1981a(b)(2) specifically excludes backpay and benefits from damages subject to the statutory limitation, and the court did not include them in its reduction calculation.

[7]This total included $300,00 reduced damages on Madison's sex claims, $76,667 in backpay and benefits on all claims, and $1,261,750 in compensatory and punitive damages on her race claims (including retaliation and constructive demotion).

asked the court to apply the Title VII cap separately to each individual act of discrimination and retaliation or to allocate the compensatory damages for sex discrimination and harassment to her claims under ICRA. She also asked the court for interest, attorney fees, front pay and additional equitable relief.[8] IBP moved for judgment as a matter of law, to alter and amend the judgment, and for a new trial based on alleged errors in evidentiary rulings, instructions to the jury, and damage issues. The United States successfully moved to intervene on the issue of the constitutionality of the damages limitation provision in Title VII.

After hearings on the post judgment motions, the court denied almost all of the motions, but it did grant Madison's request to allocate the $110,000 compensatory damage award for sexual discrimination and harassment to her state law claims, thereby avoiding the Title VII damages limitation. The court also awarded Madison attorney fees, costs, and interest. An amended judgment was then entered against IBP in the amount of $1,748,417,[9] and these appeals followed.

III.

The parties raise many issues on appeal. IBP contends that the court erred in admitting evidence of discrimination and harassment involving other employees, in

_____

[8]The equitable relief Madison sought included an order requiring IBP to make substantial changes in its training program, including 1) annual distribution of a court approved written policy against sexual harassment, discrimination, and retaliation for at least ten years; 2) at least 100 hours of court approved, equal opportunity training for personnel directors in each plant for ten years, and 40 hours for the following ten years; and 3) 40 hours annual training for Grade 10 managers for ten years. She also asked for the establishment of a first response team of mentors and an equal access committee, a permanent injunction ordering IBP to cease its discriminatory practices, and retention of federal jurisdiction for ten years to monitor IBP's compliance.

[9]Because of the reallocation to Madison's state law claims of $110,000 in compensatory damages for sex discrimination and harassment, the amended judgment was larger by that amount than the original.

-15-

submitting punitive damages to the jury, in instructing the jury on the period for which Madison could recover damages and on the standard for punitive damages, and in its application of the Title VII damages limitation. IBP also asserts that the emotional distress damages and punitive damages were excessive. It asks that the judgment be vacated, the punitive damage claims dismissed, and a new trial granted. In the alternative, IBP asks that damages be reduced.

Madison argues in her cross appeal that the Title VII limitation on damages is unconstitutional and asks that the punitive damages be restored to the amount awarded by the jury. She argues in the alternative that if the damages limitation is constitutional, it should be applied separately to every act of discrimination and retaliation that occurred after she filed her administrative complaint. The United States and IBP argue in opposition that the damages limitation provision is constitutional and that it applies to the total amount of Title VII damages.

A.

Although IBP asserted numerous evidentiary errors in its post judgment motion in the district court, it challenges only one type of evidentiary ruling on appeal. IBP contends that the trial court erred in admitting evidence of harassment and discrimination directed at other employees, arguing that it was irrelevant, confusing, and prejudicial. We review questions of admission of evidence for abuse of discretion. See Easley v. American Greetings Corp., 158 F.3d 974, 976 (8th Cir. 1998). Trial courts are afforded "wide discretion in ruling on the admissibility of proffered evidence." Id.

To determine whether a hostile work environment existed, evidence concerning "all circumstances" of the complainant's employment must be considered. Harris v. Forklift Sys., Inc., 510 U.S. 17, 22-24 (1993). "[E]vidence of a hostile environment must not be compartmentalized, but must instead be based on the totality of the circumstances of the entire hostile work environment." Delph v. Dr. Pepper Bottling

-16-

Co. of Paragould, Inc., 130 F.3d 349, 355 (8th Cir. 1997) (citations omitted). Here, Madison introduced evidence that other women and African American employees were also discriminated against and harassed. This evidence was relevant as to whether IBP maintained a hostile work environment, whether it intended to harass and discriminate against women and African Americans, and whether IBP's justifications for its refusal to discipline Madison's harassers or to promote her were pretextual. See Jackson v. Quanex Corp., 191 F.3d 647, 661 (6th Cir. 1999) (racist conduct directed at other employees probative since "[w]hat may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents") (citations omitted). Moreover, IBP made such evidence relevant by claiming that it maintained effective corporate policies prohibiting racial and sexual harassment. Madison was entitled to present evidence showing that IBP had consistently failed to prevent illegal conduct and to correct it promptly. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). This evidence supported Madison's contention that IBP failed to discipline harassers and to ensure that the civil rights of its employees were not violated.

The evidence relating to other employees was not extensive compared to the amount of evidence about conduct directed at Madison herself, and the court correctly instructed the jury on the limited purposes for which it was offered.[10] The instructions

_____

[10]The court instructed the jury that:

> [i]n determining whether discriminatory or harassing conduct was sufficiently severe or pervasive enough to create a hostile work environment for Madison, you may consider conduct towards her co-workers, so long as she was aware of that conduct and her own well-being was affected by that conduct. You may consider harassment that Madison was unaware of, in determining intent, and whether the harassment was a part of the pattern and practice of harassment against her.

This is an accurate statement of the law. See Carter v. Chrysler Corp., Inc., 173 F.3d 693, 701 fn. 7 (8th Cir. 1999) (evidence of racist graffiti which plaintiff knew about

-17-

sufficiently advised the jury that Madison could only recover for damages she herself suffered. After carefully examining the record, we conclude that the evidence was relevant and neither prejudicial nor confusing. The district court did not abuse its discretion in admitting the limited evidence of harassment or discrimination involving other employees.

B.

IBP attacks the punitive damages awarded. It contends first that the question should not have been submitted to the jury because the evidence did not meet the standard of Kolstad v. American Dental Association, 527 U.S. 526 (1999) (decided after Madison's trial, but before judgment). IBP also maintains that the jury was incorrectly instructed on the governing standard and on the time period for recovery and that the award was excessive. IBP argues that the punitive damages claim should be dismissed, a new trial provided, or the award reduced.

1.

The Supreme Court explained in Kolstad that punitive damages may be recovered for employment discrimination if "the employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Kolstad, 527 U.S. at 530 (citations omitted). In order for punitive damages to be assessed against an employer, the plaintiff must show that "an employee serving in a managerial capacity committed the wrong while acting in the scope of employment." Id. at 543 (citations omitted). An employer may escape vicarious liability for punitive damages, however, if the

_____

"relevant [to] whether a hostile environment existed and whether [plaintiff] reasonably perceived other conduct to be hostile or abusive"). The court also cautioned the jury that even though it had "heard evidence relating to harassment and/or discrimination of other employees," Madison "cannot recover, and does not claim, actual damages for anyone other than herself."

-18-

discriminatory actions of managerial agents were contrary to the employer's "good faith efforts to comply with Title VII." Id. at 545 (citations omitted). IBP contends that under this standard, punitive damages should not have been submitted to the jury because IBP had made good faith efforts to comply with anti discrimination laws and because no employees with managerial capacity acted with malice or reckless indifference to Madison's federally protected rights. Whether there was sufficient evidence to submit damages to the jury is reviewed de novo. See Henderson v. Simmons Foods, Inc., 217 F.3d 612, 618 (8th Cir. 2000).

Kolstad incorporated existing law into its discussion of the standard for submitting punitive damages in employment discrimination cases, citing language from Title VII and Smith v. Wade, 461 U.S. 30 (1983) in its definition of "malice" and "reckless indifference." Id. at 534-36. The Supreme Court had previously ruled that involvement of managers in discriminatory conduct could make employers liable, see Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), and that an affirmative defense was available to employers who exercised reasonable care to prevent violations of the law and to correct them promptly. This affirmative defense was only available, however, where no tangible employment action had been taken and the employee had unreasonably failed to take advantage of any preventive or corrective opportunities. See Faragher, 524 U.S. at 807, Ellerth, 524 U.S. at 765. Kolstad built on these concepts in clarifying that liability for punitive damages could be avoided if the employer established that its managers' actions were contrary to its "good-faith efforts to comply with Title VII." Kolstad, 527 U.S. at 545-46 (citations omitted). Kolstad also clarified that a plaintiff need not show "egregious misconduct" on the part of an employer in order to submit punitive damages. Id. at 538.

Madison presented a great deal of evidence from which the jury could find that IBP employees in a managerial capacity acted with malice or reckless disregard to her civil rights in failing to protect her from illegal conduct or to promote her. The evidence indicated that supervisors and managers were among those who harassed and

abused her. High level employees such as Personnel Director Alberto Olguin and Plant Manager Larry Moser, both of whom had authority to terminate employees, ignored her complaints about illegal harassment and discrimination, failed to investigate whether her civil rights were being violated, and did not document illegal behavior or discipline perpetrators. The company's EEO Coordinator, Bernielle Ott, was present at a mediation session at which Madison told Ott and other IBP representatives that she was being physically and verbally harassed almost daily and that she had been repeatedly denied promotions because of her sex. Neither Ott nor any other company representative took action to investigate these allegations or to ensure that Madison's civil rights were not being violated.

IBP contends that it should escape liability for punitive damages because it made good faith efforts to comply with federal employment laws. The company presented evidence at trial that it had a corporate policy prohibiting racial and sexual discrimination and harassment, that it maintained an affirmative action plan, and that it put on an annual two hour training session for plant managers on the "Legal Aspects of Supervision." There was also evidence, however, that the written corporate policies were not carried out at the Perry plant and that the company did not make good faith efforts to comply with federal civil rights laws.

Employers have an "affirmative obligation" to prevent civil rights violations in the workplace. Faragher, 524 U.S. at 806. There was evidence that IBP did not have effective procedures in place to encourage employees to come forward with employment complaints or to protect them from retaliation. Madison and other employees complained to management on many occasions that their civil rights were being violated, but management did not take reasonable care to investigate or stop such behavior. There was evidence that Personnel Director Olguin, the manager charged with addressing employee grievances, conflicts, and disciplinary matters, did not investigate many complaints of harassment and discrimination. On at least fourteen occasions, an employee was counseled for engaging in harassing conduct, but nothing was recorded in his personnel file. Training Coordinator Mike Miller ignored

-20-

Madison's reports that male line workers were grabbing and fondling her, did nothing to discipline her harassers, and relied on an unsubstantiated report from one line worker that Madison had willingly engaged in horseplay on the line. When Madison informed Assistant Personnel Director Sue Menhusen that she was being harassed, Menhusen's response was that many of the Hispanic males working at the plant "haven't been in the country for very long" and "don't take direction very well from females." There was also evidence that IBP maintained policies which actually served to punish victims and discourage them from reporting illegal behavior, such as telling an alleged harasser the identity of a complainant and putting "counseling for sexual harassment" notations in the personnel files of any complaining employee.

We conclude that there was sufficient evidence under Kolstad to submit the issue of punitive damages to the jury.

2.

IBP argues that even if there was sufficient evidence to submit punitive damages, it is entitled to a new trial because the district court erred in instructing the jury on the time period[11] for which Madison could recover punitive damages on her Title VII and § 1981 claims. Although Madison pled violations of both state and federal discrimination laws, she could only recover punitive damages under federal law because Iowa does not provide for punitive damages in employment discrimination cases. See City of Hampton v. Iowa Civil Rights Comm'n, 554 N.W.2d 532, 537 (Iowa 1996).

---

[11]The district court and the parties refer to the period for which Madison was entitled to recover damages as the statute of limitations period, but it may be more precisely termed the damages recovery period. The issue here is the time for which Madison may collect damages, rather than the deadline by which she had to file her lawsuit.

IBP maintains that the district court erred in instructing the jury that "[p]unitive damages are limited to conduct occurring after January 13, 1993," or two years before she filed her administrative complaint. It contends that Madison can recover under § 1981 only for race based violations after September 18, 1994 (two years before she filed her federal lawsuit) and under Title VII only for sex based violations committed after March 19, 1994 (300 days before she filed her administrative charge). Madison asserts that she was entitled to a two year period for her sex claims under Title VII and a four year period for her race, retaliation, and constructive demotion claims under § 1981. She acknowledges, however, that she agreed to a uniform two year limitations period at trial in order to simplify issues for the jury, and she does not now challenge the court's use of that date. The district court's statutory interpretation is a legal conclusion which is reviewed de novo. See United States v. Vig, 167 F.3d 443, 447 (8th Cir. 1999).

In the Eighth Circuit plaintiffs may only recover damages on their federal employment discrimination claims for acts committed during the statute of limitations period, even if there was a continuing violation. See Kline v. Kansas City Fire Dept., 175 F.3d 660, 665 (8th Cir. 1999). This means that the damages recovery period for federal employment discrimination claims in this circuit is the same as the period in which a plaintiff must file her claim. Other circuits permit a plaintiff to recover under federal law for the period of any continuing violation.[12] The rationale for the Eighth Circuit rule is that it "strikes a reasonable balance between permitting redress of an

---

[12]See, e.g., Bonner v. Guccione, 178 F.3d 581, 583-84 (2d Cir. 1999) (Title VII plaintiff can recover for conduct that occurred outside 300 day limitation period if she can demonstrate that she was subject to continuous policy and practice of discrimination); Provencher v. CVS Pharmacy, Div. of Melville Corp., 145 F.3d 5, 14 (1st Cir. 1998) (continuing violation doctrine allows plaintiff to receive damages on otherwise time barred acts); Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 481 (3d Cir. 1997) (employee who demonstrates continuing Title VII violation may recover damages for entire continuing violation, and 300 day filing period will not bar recovery).

ongoing wrong and imposing liability for conduct long past." Ashley v. Boyle's Famous Corned Beef Co., 66 F.3d 164, 167-68 (8th Cir. 1995) (en banc).

Because Title VII has a 300 day limitations period, the district court should have instructed the jury that Madison could only recover damages under Title VII for illegal acts occurring within the 300 day period prior to the filing of her administrative charge. See Gipson v. KAS Snacktime Co., 83 F.3d 225, 229 (8th Cir. 1996). Since Madison filed her charge on January 13, 1995, she was entitled to recover damages under Title VII only for acts of discrimination or harassment occurring after March 19, 1994. The court therefore erred in instructing the jury that she could recover punitive damages under Title VII for illegal acts occurring after January 13, 1993.

Because § 1981 does not have its own statute of limitations, courts employ the limitations period provided by state law for personal injury cases. See Goodman v. Lukens Steel Co., 482 U.S. 656, 660-62 (1987). The Iowa limitations period for personal injury actions is two years. See Iowa Code § 614.1(2) (Supp. 1999). IBP contends that this two year recovery period should be applied to Madison's § 1981 claims and that it should not be triggered by the date of her administrative complaint because § 1981 does not require exhaustion. IBP says that the recovery period should be determined from the date she filed this action, September 18, 1996. Madison argues that the four year statute of limitations in 28 U.S.C. § 1658 controls the period for recovery under § 1981, but she acknowledges that she agreed to no more than a two year uniform recovery period.

Section 1658 became law in December 1990 and provides that "a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues." Madison contends that her civil action arises under an enactment subsequent to the passage of this statute because the Civil Rights Act of 1991 amended § 1981 to permit lawsuits

for racially discriminatory conduct subsequent to the formation of a contract.[13] The district court believed that § 1658 would apply if Madison had not "agreed to a more restrictive statute of limitations period."

Subsequent to the final judgment in this case, the Third Circuit considered whether the § 1658 four year statute of limitations applies to claims under the 1991 amendments to § 1981, and it decided that § 1658 does not apply. See Zubi v. AT&T Corp., 219 F.3d 220 (3d Cir. 2000). The Zubi court reasoned that "when Congress amends a preexisting statute it does not create a 'new act,' and claims arising under the statute as amended continue to arise under the preexisting statute." Id. at 225. It is "only when Congress establishes a new cause of action without reference to preexisting law that § 1658 applies." Id. at 225. The court concluded that the 1991 amendments to § 1981 did not create a new cause of action, and that the four year statute of limitations in § 1658 was not applicable to cases brought under § 1981. Id. at 225-26.

We agree with the reasoning articulated in Zubi. The words used by Congress are significant. The phrase "an Act of Congress enacted" after 1990 is not equivalent to the phrase "an Act of Congress enacted or amended" after that year. Furthermore, the legislative history of the Civil Rights Act of 1991 indicates that Congress intended that the applicable state statutes of limitations for personal injury claims would continue to apply to § 1981 claims. See H.R.Rep. No. 102-40(I), at 63 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 601 (discussing proposed amendment to Title VII limitations period). We conclude that the Civil Rights Act of 1991 was not the type of enactment Congress intended to include in the § 1658 four year limitations period and that the

---

[13]This legislation was passed in reaction to the Supreme Court's decision in Patterson v. McLean Credit Union, 491 U.S. 164 (1989), that the "make and enforce contracts" language in § 1981 prohibited discriminatory hiring but not subsequent discrimination. One of the amendments added wording to clarify that the statue also prohibited discrimination in the "performance, modification and termination of contracts" and protected "the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

Iowa two year statute therefore applies to Madison's § 1981 claims. Since Madison filed her federal complaint on September 18, 1996, she was only entitled to recover under § 1981 for illegal acts occurring after September 18, 1994. The district court therefore erred by instructing the jury that January 13, 1993 was the cutoff date for damages on Madison's § 1981 claims.

Since the jury was not correctly instructed on the period for which Madison could recover punitive damages under either Title VII or § 1981, the punitive damages award must be vacated and remanded for a new trial. It is therefore unnecessary to address any remaining issues raised by IBP related to punitive damages.

C.

IBP also attacks the emotional distress damages awarded. It contends that the district court erred in instructing the jury on the time period for which Madison could recover emotional distress damages. It also argues that the emotional distress award was excessive and that the district court erred in its allocation of these damages.

1.

IBP contends that the district court erred in instructing the jury on the time period for which Madison could recover emotional distress damages. Madison asserted at oral argument that even if the court erred in instructing on the recovery period under Title VII and § 1981, her entire compensatory damage award was recoverable under ICRA. We review de novo the district court's legal conclusions regarding the statutes. See United States v. Vig, 167 F.3d 443, 447 (8th Cir. 1999).

The jury was instructed that Madison could not "recover for any unlawful incidents or damages prior to January 13, 1993," which was two years before the date on which she filed her administrative charge. IBP argues that Madison cannot recover damages under ICRA for any acts of sex based illegal behavior before July 17, 1994

(180 days prior to her filing an administrative charge) or for any acts of race based illegal behavior before October 6, 1995 (180 days prior to amendment of the administrative charge to include race). See Iowa Code § 216.15(12) (Supp. 2000) (discrimination charge must be filed within 180 days of alleged unlawful employment practice).

Madison argues that she suffered a continuing violation of her civil rights while at IBP, and that under Iowa law she is entitled to recover damages on her ICRA claims for the entire period her rights were violated. See Hy-Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n, 453 N.W.2d 512, 530-31 (Iowa 1990). She acknowledges, however, that she agreed to a uniform two year recovery period and cannot now recover beyond that date.

Madison's complaint alleged violations under both federal and state law. ICRA and Title VII both prohibit employment discrimination and harassment on the basis of either race or sex. See Iowa Code § 216.6(1)(a) and 42 U.S.C. § 2000e, et. seq. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981.

The elements of liability under these statutes are the same for federal and state claims. See Montgomery v. John Deere & Co., 169 F. 3d 556, 558 n. 3 (8th Cir. 1999) (discrimination claims under ICRA are analyzed in same manner as their federal law counterparts); Moschetti v. Chicago, Cent. & Pacific R.Co., 119 F.3d 707, 709 n. 2 (8th Cir. 1997) (analysis of retaliation claims is the same under Title VII and ICRA); Henderson v. Heartland Press, Inc., 65 F.Supp.2d 991, 999 (N.D. Iowa 1999) (prima facie case for actionable hostile work environment the same under both ICRA and Title VII); Schwarz v. Northwest Iowa Comm. Coll., 881 F.Supp. 1323, 1338 (N.D. Iowa 1995) (test for constructive discharge); Naylor v. Georgia-Pacific Corp., 875 F.Supp.

564, 573 (N.D. Iowa 1995). The jury was given one set of liability and damage instructions for all of Madison's claims, and it was not asked to differentiate among the statutes when awarding damages. The claims were therefore "effectively fungible," and we conclude that Madison's damage award for emotional distress is recoverable under ICRA. Passatino v. Johnson & Johnson Consumer Prod., Inc., 212 F.3d 493, 509 (9th Cir. 2000).

Although Iowa requires that a discrimination charge be filed within 180 days, it does not limit the period for which damages can be recovered when there has been proof of a continuing violation. Iowa permits recovery of damages for the entire period that a plaintiff's rights were violated. See Hy-Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n, 453 N.W.2d 512 (Iowa 1990). In Hy-Vee, the Iowa Supreme Court affirmed an award of back pay for a seven year period for which the plaintiff had shown a continuing violation, reasoning that an award for the full period was "consistent with the ultimate goal of compensating an injured person: to place the injured person in the position the person would have been in had there been no injury." Id. at 531. The Hy-Vee court also held that "the alleged discrimination must be ongoing" to be considered a continuing violation. See Hy-Vee, 453 N.W.2d at 527-28. See also Rorie v. United Parcel Service, Inc., 151 F.3d 757, 761 (8th Cir. 1998) (if plaintiff can show "an ongoing pattern or practice of discrimination rather than one isolated instance, the alleged violation shall be deemed continuing") (citations omitted). Evidence of a hostile work environment can constitute a continuing violation. See Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 573 (8th Cir. 1997).

IBP contends that this court should apply the circuit limitations rule for federal damages to Madison's ICRA claims. It argues that Hy-Vee is inconsistent with our cases holding that a federal employment discrimination plaintiff may only recover damages for acts which took place during the statute of limitations period, even where there was a continuing violation. See, e.g., Ashley v. Boyle's Famous Corned Beef Co., 66 F.3d 164, 167-68 (8th Cir. 1995) (en banc).

The Iowa Supreme Court has declared its own rule for the damages recovery period under ICRA, however, and it has not repudiated its reasoning in Hy-Vee or adopted the Ashley damages recovery rule, a rule unique among the federal circuits. As the Iowa Supreme Court has explained, Iowa courts "traditionally turn to federal law for guidance in evaluating the ICRA, [but f]ederal law . . . is not controlling." Vivian v. Madison, 601 N.W.2d 872, 873 (Iowa 1999) (citations omitted). We conclude that ICRA should be interpreted in accordance with expressed Iowa law.

Madison produced a great deal of evidence that she had experienced a continuing violation of Iowa law against racial and sexual discrimination and harassment. The record reveals an ongoing pattern and practice of illegal behavior, not just isolated instances. Almost from the time she started work at the IBP plant in 1989, Madison was subjected to continuous and pervasive discrimination and harassment. Beginning in the early 1990s, supervisors told her that women did not "belong in packinghouses" and refused to let her learn what they considered to be "men's jobs." Other supervisors refused to intervene when a coworker told her that she had "ruined herself" by "having fucking nigger babies." Coworkers consistently called her derogatory names, made hurtful comments about the race of her husband and children, and offensively grabbed and touched her. When Madison reported this conduct to management, she was retaliated against for complaining and was eventually forced to take a constructive demotion to escape the offensive work environment. This illegal behavior continued up to the filing of her lawsuit. Moreover, Madison applied for at least 23 promotions between April 1991 and July 1997, and the evidence indicated that she was denied these positions because IBP management was biased against women and workers involved in interracial relationships.

We conclude that Madison proved a continued violation of her civil rights from the time she began working at IBP in 1988 until she filed her federal lawsuit in 1996. Under Iowa law, this would have entitled her to recover damages for the entire period of that continuing violation. Because she agreed to a uniform limitations date at trial, however, Madison may only recover damages for illegal acts occurring after

-28-

January 13, 1993. Madison presented evidence that she experienced many serious acts of discrimination, harassment, and retaliation, as well as constructive demotion after that date – sufficient evidence of illegal acts during that time period to justify the amount of compensatory damages. We conclude that the district court was not required to limit her recovery under ICRA to a 180 day period and that it did not err in instructing the jury that she could recover under ICRA for a two year period.

2.

IBP contends that the district court erred by granting Madison's post judgment motion to allocate the $110,000 compensatory damage award for sexual discrimination and harassment to her state law claims, thereby avoiding the Title VII damages limitation provision. According to IBP, the Title VII damages cap of $300,000 should have been applied to all of the damages awarded on Madison's sex claims. Madison responds that the award was properly allocated. The district court generally has discretion regarding how to allocate a damage award, but we apply de novo review to the extent an allocation decision rests on an interpretation of a statute. See Vig, 167 F.3d at 447 (8th Cir. 1999).

In granting Madison's motion for reallocation of her sex based damages, the district court observed that the verdict had not tied the question of damages to a particular statute, that the standard of liability under all three statutes was the same, and that allocation would permit Madison to recover more of the damages awarded by the jury. Appellate courts have approved the allocation of damages between state and federal claims in cases such as this where the standards of liability are the same and the jury has not been asked to distinguish between statutes in assessing damages. The D.C. Circuit concluded in a similar situation that there was no reason why the plaintiff could not recover her judgment under the local Human Rights Act, "since the local law contains the same standards of liability as Title VII but imposes no cap on damages." Martini v. Federal National Mortgage Ass'n, 178 F.3d 1336, 1349 (D.C. Cir. 1999) The Martini court noted that the standards of liability for the plaintiff's local and federal

claims were the same, and it reasoned that if courts were not permitted "to treat damages under federal and local law as fungible where the standards of liability are the same, [it] would effectively limit the local jurisdiction's prerogative to provide greater remedies for employment discrimination than those Congress has afforded under Title VII." Id. at 1349-50.

The Ninth Circuit has also approved allocation of compensatory damages to a plaintiff's state law claims where the verdict form permitted the jury to award damages on state and federal civil rights claims without specifically distinguishing them. See Passatino v. Johnson & Johnson Consumer Products, Inc., 212 F.3d 493 (9th Cir. 2000). Since "the jury had awarded damages without differentiating between the claims, the awards were effectively fungible, and the district court's action was entirely within its discretion and consistent with the jury's verdict." Id. at 509.

We find the reasoning in Martini and Passatino persuasive and consistent with federal policy. Title VII states that nothing in its provisions "shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State . . ." 42 U.S.C. § 2000e-7. To prohibit courts from allocating damages after a jury verdict finding liability under both federal and state law would conflict with the statutory framework of Title VII and the congressional policy to deter discrimination and harassment. See Kimzey, 107 F.3d at 576 ("no language in Title VII indicat[es] that its upper limit is to be placed on awards under state anti-discrimination statutes"). The jury in this case found for Madison on both her state and federal sexual harassment and discrimination claims, and no persuasive reason has been shown why she should be prevented from receiving her award for compensatory damages under ICRA instead of under the federal statutes. The trial court did not err in its allocation of Madison's compensatory damages for sex based violations to her state law claims.

3.

Finally, IBP argues that the jury award of $266,750 for emotional distress damages was excessive and that the trial court erred by denying its motion to reduce it. We review the denial of IBP's motion for abuse of discretion, and we "will reverse a denial of remittitur only when in rare circumstances we are pressed to conclude that the verdict represents a monstrous or shocking injustice." Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1061-62 (8th Cir. 1993) (citations omitted).

Madison presented voluminous evidence that she suffered severe emotional distress as a result of the harassment and discrimination she endured after January 13, 1993. She was subjected to egregious and humiliating conduct which wreaked havoc on her emotional health and caused her great anguish which manifested itself physically. The taunting and harassment made her feel humiliated, hurt, and degraded. The undisputed evidence indicated that Madison was made so distraught by the behavior of fellow employees and managers that she often left her work station in tears. Her family life was affected by what went on in the plant. Her working conditions strained her relationship with her husband and nearly caused the breakup of their marriage. The couple separated several times during the course of her employment at IBP. Madison also testified that as a result of her stressful work environment, she lost weight, had trouble sleeping and frequent headaches, and broke out in hives. The evidence about the physical and emotional effects on Madison was corroborated by her family and several coworkers. Keith Ratliffe, a minister who counseled Madison on at least four occasions during these events, described her as depressed and emotionally drained because of her experiences at IBP.

This award is not excessive in light of the evidence or when compared to awards in similar cases. In Wilmington v. J.I. Case Co., 793 F.2d 909, 922 (8th Cir. 1986), a $400,000 jury award for emotional distress was affirmed where "[the plaintiff's] testimony as well as that of other witnesses tended to show a deterioration in his health, mental anxiety, humiliation, and emotional distress resulting from the conditions under which he worked . . . and from his discharge." See also Ross v. Douglas Cty., 234 F.3d 391, 397 (8th Cir. 2000) ($100,000 award for emotional distress not excessive

-31-

where victim of race discrimination suffered emotional and financial strain after leaving hostile work environment where he was taunted with racial epithets); Passatino v. Johnson & Johnson Consumer Prod., Inc., 212 F.3d 493, 503, 513-14 (9th Cir. 2000) (affirming $1 million emotional distress award for sexual harassment where plaintiff "worried, cried, and felt trapped and upset," spent less time with her family, suffered stomach problems, rashes and headaches, and sought counseling with her pastor).

The evidence distinguishes this case from others such as Delph v. Dr. Pepper Bottling Co. of Paragould, 130 F.3d 349, 357-58 (8th Cir. 1997), in which an emotional distress award was reduced from $150,000 to $50,000 where the race discrimination plaintiff suffered "vague and ill-defined" emotional and physical problems. Id. at 357-58. Madison suffered more serious and better documented symptoms of emotional distress than the plaintiff in Delph. She was also subjected to a more severe and continuous pattern of harassment. A careful review of the record convinces us that the jury's award "was not a plain injustice, or a monstrous or shocking result." Wilmington, 793 F.2d at 922. The district court did not abuse its discretion in denying IBP's motion for remittur of the damages for emotional distress.

In conclusion, we hold that the district court did not err in instructing the jury on the time period for which Madison could recover compensatory damages and did not abuse its discretion in denying IBP's motion to remit the damage award for excessiveness. Nor did the court err in allocating the $110,000 compensatory damage award for sex based illegal acts to her state law claims. We therefore affirm the award of compensatory damages in its entirety.

D.

IBP claims that the district court erred in concluding that Madison could recover her damages for retaliation and constructive demotion under § 1981 rather than Title VII because she did not produce sufficient evidence of race based retaliation or constructive demotion. The jury awarded $150,000 in punitive damages on Madison's

retaliation claim and $25,000 in punitive damages and $1750 in past emotional distress damages on her constructive demotion claim. According to IBP, the Title VII damages cap of $300,000 should have been applied to the damages awarded on these claims. Madison responds that she produced sufficient evidence of race based retaliation and constructive demotion and is entitled to recover these damages under § 1981. The district court's resolution of this issue is reviewed de novo. See Vig, 167 F.3d at 447 (8th Cir. 1999).

The instructions for her retaliation claim permitted the jury to find liability if her complaints of either racial or sexual discrimination or harassment were a motivating factor in IBP's decision to discipline her or not to promote her. The instructions for her constructive demotion claim similarly permitted the jury to find liability if her demotion resulted from either race or sex based behavior. The trial court concluded that there was sufficient evidence to submit these claims under all three statutes, and we agree. We also agree that Madison produced sufficient evidence for the jury to predicate its retaliation and constructive demotion verdicts on either illegal race or sex based actions. The record shows that Madison was unfairly disciplined and denied promotions in large part because she regularly complained to management that she was being subjected to racial discrimination and harassment. She also took a constructive demotion to a lower paying job in December 1994 to escape racial harassment from supervisor Eugene Jackson, who was aware of her interracial relationship and who told her that he did not believe that "the races should mix." Jackson regularly made Madison perform utility tasks instead of her trainer duties and refused to intervene when other employees physically and verbally harassed her. The fact that the jury awarded Madison very large damages on her race claims, see footnotes 4-5, indicates that it found her evidence of race based violations persuasive.

We conclude that the district court did not err in determining that Madison's retaliation and constructive demotion claims were recoverable under § 1981 and that it was not necessary to apply the Title VII damages cap to these claims. The $1750 award for past emotional distress on Madison's constructive demotion claim is

recoverable under ICRA as well as § 1981, and that award is affirmed. The punitive damages for retaliation and constructive demotion must be vacated and remanded, however, because of the faulty instructions on the period for which Madison could recover.

E.

In her cross appeal, Madison contends that 42 U.S.C. § 1981a(b)(3)[14] is unconstitutional, and she also argues that the district court erred in applying it. She seeks restoration of the full amount awarded by the jury. In the alternative, she asks that the limitation provision be applied separately to each distinct illegal discriminatory and retaliatory action perpetrated against her, rather than to her entire action. Both the United States and IBP respond that the limitation provision does not violate the Constitution.

Madison maintains that the Title VII limitation provision violates the Seventh Amendment right to trial by jury, that it legislatively usurps the court's role in reviewing damage awards, and that it violates equal protection guarantees because it limits recovery by women while racial and ethnic minorities might recover more under 42 U.S.C. § 1981. She also claims that the provision violates the due process clause because it does not bear a "real and substantial relation to protecting public health and welfare." She argues alternatively, without supporting legal authority, that the damages

---

[14]42 U.S.C. § 1981a(b)(3)(D) provides that:

> The sum of the amount of compensatory damages awarded under [Title VII] for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party--(D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

limitation, if constitutional, must be separately applied to each distinct illegal act directed at her after she filed her administrative complaint. The district court's resolution of these issues is reviewed de novo. See United States v. Crawford, 115 F.3d 1397, 1400 (8th Cir. 1997) and Braswell v. City of El Dorado, 187 F.3d 954, 957 (8th Cir. 1999).

We conclude that § 1981a(b)(3) passes constitutional muster. Congress created the Title VII cause of action and has the power to set limits for recovery under it. The statute does not violate the Seventh Amendment because it does not impinge upon the jury's fact finding function. In applying the provision, a court does not "reexamine" the jury's verdict or impose its own factual determination as to what a proper award might be. Rather, it implements the legislative policy decision by reducing the amount recoverable to that deemed to be a reasonable maximum by Congress. See Davis v. Omitowoju, 883 F.2d 1155, 1162 (3d Cir. 1989). The statute does not violate the separation of powers because it is the province of the legislative branch to pass laws and that of the courts to interpret and apply them to particular cases. See Plaut v. Spendthrift Farm, 514 U.S. 211, 222-25 (1995). As the Sixth Circuit explained in rejecting a similar challenge, "Congress created Title VII, and Congress may designate the remedies under Title VII." Pollard v. E.I. DuPont de Nemours Co., 213 F.3d 933, 945-46 (6th Cir. 2000), *rev'd on other grounds*, 2001 WL 589077 (U.S.Tenn.). In creating a statutory right, Congress "clearly has the discretion . . . to prescribe remedies." Northern Pipeline Construction v. Marathon Pipe Line Co., 458 U.S. 50, 83 (1982). "The fact that the judicial branch is limited [by the provision] in the amount of damages which it may award does not mean that its ability to decide cases is being impaired by Congress" or that the provision violates the separation of powers principle. Pollard, 213 F.3d at 946.

We also reject Madison's argument that the statutory provision violates the implied equal protection clause of the Fifth Amendment. The provision makes no distinction on the basis of gender or any other impermissible classification and is therefore analyzed under the rational basis test. See Duke Power Co. v. Carolina Envtl.

Study Group, Inc., 438 U.S. 59, 83-84 (1978).  As Pollard and other cases have recognized, the provision easily satisfies this test because it bears a rational relationship to a legitimate and articulated  governmental purpose.  See Pollard, 213 F.3d at 946. Congress instituted the damages limitation in order to deter frivolous lawsuits and to protect employers from financially crippling awards, and the limitation is rationally related to these legitimate purposes.  See Luciano v. Olsten Corp., 110 F.3d 210, 221 (2d Cir. 1997) (citing Congressional Record).  Madison's due process argument fails for similar reasons, and she cites no cases to support it.

Madison argues in the alternative that the trial court should have applied the damages limitation to each individual act of discrimination and retaliation against her after she filed her administrative complaint, rather than to the whole award under Title VII.  This argument is unsupported by the statutory language or case law.  We agree with the other circuits which have rejected similar arguments.  See Baty v. Williamette Indus., Inc., 172 F.3d 1232, 1245-46 (10th Cir. 1999) (limitation applies to entire Title VII award) and Smith v. Chicago Sch. Reform Bd. of Trustees, 165 F.3d 1142, 1150 (7th Cir. 1999) (same).

IV.

Madison produced an abundance of evidence that she was subjected to a pervasively hostile work environment at IBP and was discriminated against because of her sex and her biracial relationship and that management itself was implicated in these illegal acts.  She also showed that she was retaliated against for complaining to management and for filing an administrative complaint.  As a result of these illegal acts, she was constructively demoted and suffered emotional distress.

After thoroughly reviewing the lengthy record, we affirm the award to Madison of $343,417 in backpay, benefits, and compensatory damages.  We also affirm the ruling that the damages limitation set by Congress in 42 U.S.C. § 1981a(b)(3) is not unconstitutional.  We vacate the entire punitive damages award because of errors in the

jury instructions on the recovery period, and we remand for a new trial on punitive damages. The award for attorney fees, costs, and interest is also vacated and those issues are remanded for further consideration by the district court at an appropriate time.[15]

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[15]The district court awarded Madison a total of $444,691.33 in attorney fees and costs, as well as pre and post judgment interest. The extent to which Madison will ultimately prevail is not yet known and will depend upon further proceedings in the district court and its evaluation of the relevant factors. See Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). It is also not clear at this point how the interest issues may be impacted.